606 So.2d 1051 (1992)
Clayton Michael JONES
v.
STATE of Mississippi.
No. 89-KA-0875.
Supreme Court of Mississippi.
July 29, 1992.
*1052 Gene Brown, Meridian, for appellant.
Michael C. Moore, Atty. Gen., Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and SULLIVAN, JJ.
SULLIVAN, Justice, for the court:

I.
Clayton Michael Jones was indicted by a Lauderdale County grand jury for sexual penetration of his five (5) year old daughter, M.J., in violation of Miss. Code Ann. § 97-3-95 (1972). Jones was tried before a jury and found guilty as charged. Jones was sentenced to thirty (30) years in the custody of the Mississippi Department of Corrections, with ten (10) years suspended and five (5) years probation. Jones appeals to this Court and assigns as error:
1. Trial court did not have venue.
2. The trial court erroneously allowed the jury to hear and consider hearsay evidence.
3. The trial court erred in allowing the state to excessively lead the witness.
4. The trial court erred in refusing to grant instruction D-5.
5. The trial court erred in overruling the motions for directed verdict and motion for judgment notwithstanding the verdict and/or new trial.
*1053 Finding no merit to these assignments we affirm.

II.
On the Wednesday after the Father's Day weekend of June 1988, Elaine Randall left her two children, five year old M.J. and four year old Billy with her friend Kathy Booth, while she and her husband, James Randall, went to play bingo. Billy was asleep in Booth's room and M.J. was playing with Booth's five year old son Bubba in his room. After a while they closed the door and Booth, thinking they had fallen asleep, went in to check on them. When she opened the door, she found her son lying on the bed, with only his shirt on, and M.J. next to him with his penis in her mouth. Booth separated the two children and sent M.J. to the living room. Booth then tried to talk to M.J. and asked her where she learned to do something like that. M.J. asked Booth that she not tell her mother and then said that she got it from her real daddy, Mike Jones; that he had showed her how to "suck his goober." Booth asked M.J. if any thing else happened and M.J. replied that he had stuck his finger in her "poo-poo." M.J. told Booth that this occurred in her father's trailer.
Booth informed Elaine about what had happened. The next day Elaine took M.J. to the welfare department, and then went to a doctor who examined M.J. From there they contacted Deputy Chuck Fowler at the Lauderdale County Sheriff's Department. Deputy Fowler, who specialized in child abuse investigations, interviewed M.J. on three separate occasions. Deputy Fowler used anatomically correct dolls to get M.J. to demonstrate what had happened to her. The dolls were labeled with family names, with the father figure labeled as Mike Jones, M.J.'s real father. M.J. undressed the doll that represented her and placed it face down in the lap of the father figure. On the basis of the demonstration, Deputy Fowler obtained a warrant for the arrest of Michael Jones.
Jones was arrested a few days later at his mother's house. On August 1, 1988, an indictment was filed by a Lauderdale County grand jury, indicting Jones for the wilful, unlawful, and felonious sexual penetration of M.J. in violation of Miss. Code Ann. 97-3-95 (1972). The case came to trial a year later, on June 28-30, 1989.
At trial Dr. Harriet Hampton testified that she initially examined M.J. on July 5, 1988. Her examination showed hymenal alterations. There was a disruption, laceration, or tear at the twelve and six o'clock positions. There was some mounding and scarring as well as generalized rounding of the hymenal borders. Dr. Hampton was asked what M.J. told her about what had happened. Over Jones' objection the trial court allowed Dr. Hampton to read from her report that M.J. said, while pointing to the vaginal region, that her father touched her and that she said that she did "suck Dad's drooper." Dr. Hampton recorded that M.J. indicated that it occurred some five times. Dr. Hampton stated that the physical exam was consistent with manipulation in the vaginal region.
Dr. Hampton did a culture of M.J.'s throat and mouth to determine whether or not a male penis had been in her mouth. There was no medical evidence that a male penis had been in M.J.'s mouth. She also indicated that it was possible that the hymenal alterations could have been caused by another traumatic event.
Elaine Randall, M.J.'s mother, testified that at the time of the incident she and M.J.'s real father, Michael Jones, were divorced and she was married to James Randall. She testified that there had been previous problems with M.J.'s vaginal area in January of 1988, from an alleged incident of molestation at school by other children. Elaine did not report this alleged molestation.
The Randall household consisted of Elaine and her husband, James, her stepson, James, Jr., and her two children M.J. and Billy. Her son from her first marriage also lived with them until he left in January of 1988. Elaine indicated that no one else had the access or time with M.J. to molest her. She denied ever leaving M.J. with her brothers, but testified that James babysat *1054 when he came in from work. On cross-examination, it was raised that James was an admitted child molester.
M.J., six years old at the time of the trial and found competent to testify, took the stand after her mother. During her testimony, M.J. demonstrated with the dolls what happened to her. She labeled the father doll as Mike. M.J. took one of the hands of the male doll and placed it in the genital area of the female doll. She placed the face of the female doll over the penis of the male doll. M.J. stated that the incident occurred in a trailer, but that it was not at her grandmother's trailer. M.J. did not know how she got to the trailer. On cross-examination, M.J. was asked whether she dreamed the incident or whether it really happened. She indicated that she did not know if it was a bad dream. On redirect she testified that the incident was real and that she had bad dreams about what happened.
Deputy Chuck Fowler testified about his interview with M.J. and her initial demonstration with the dolls. He stated that he got M.J. to name the dolls for the members of her family, naming the father figure after Jones, and that they eliminated nonessential members. He asked M.J. to show him what happened and what she had been required to do. M.J. proceeded to undress the dolls and place the face of the girl doll down in the lap of the male doll. He stated that no other suggestions were made to M.J.. Deputy Fowler testified that after a warrant was obtained, Jones was later arrested at his mother's home in Collinsville, Lauderdale County. Jones was found in a trailer next door to his mother's home.
Deputy Fowler was asked about the other male members of M.J.'s family and why he focused on Jones as a suspect. He stated that his first knowledge of Jones being a suspect was in the doctor's report. He also suspected Jones because of his interviews with Elaine. Deputy Fowler did suspect the stepfather and stepbrother because they were male figures in the house. He later found out that James Randall was an admitted child molester, but because of his cooperation he did not put him under the scrutiny of suspicion. Deputy Fowler stated that during the demonstration he suggested that M.J. name the father figure after her real daddy, Jones, instead of after her stepfather, because she had mentioned her real daddy in previous reports.
After the state rested, counsel for Jones moved for a directed verdict. The trial court overruled the motion.
Kathy Booth, testifying in the defendant's case, told how she found M.J. with her son's penis in her mouth. On cross-examination the state asked Booth what M.J. said to explain the incident. Booth stated that M.J. said that she was at her dad's trailer and that "he showed her to  how to suck his, goober." Booth testified that she asked M.J. what else happened, and M.J. responded that her father "stuck his finger in her poo-poo." Booth asked M.J. if she was sure it was her dad and she said yes. M.J.'s exact words were, "my real daddy, Mike Jones."
Jones' mother, Rosalee Andrews, testified as to Jones' infrequent visits with M.J. and Billy. She stated that Jones was on medication, which he took at night before he went to bed and which made him sleep through the night and late into the morning. The medication made it difficult to get Jones out of bed. She indicated that when M.J. and Billy were at her home, Jones had no opportunity to be alone with M.J. because there were too many children and grandchildren. She testified that Elaine allowed her to have M.J. and Billy during the Father's Day weekend of 1988. That Saturday afternoon, Jones and M.J. left to go to his girlfriend's house, where they spent the night. They returned that Sunday afternoon.
Mrs. Andrews testified that later that Sunday she gave M.J. a bath and M.J. indicated that she had some knowledge of male and female genitals. Mrs. Andrews stated that M.J's stepbrother, James, told her these things. She also testified that she had been to Elaine's home and found M.J. there with just her brothers.
Jones' girlfriend, Frances Owens, testified that Jones and M.J. came to her home the day before Father's Day. Jones first *1055 came to her daughter's trailer and later he and M.J. came to her apartment. She testified that Jones did not have an opportunity to be alone with M.J. at her apartment.
Sarah Smith, Jones' sister, testified that she lived in the trailer next door to her mother's home. She recalled that Jones was staying in her mother's home during the Father's Day weekend, though he at one time lived in the trailer with her. She also recalled that Jones and M.J. left that Saturday afternoon to see his girlfriend. Jones had tried to take Billy, but he wanted to stay and play with his cousins. Jones and M.J. returned that Sunday afternoon. Mrs. Smith testified that when she was not in her trailer she kept it locked and that Jones did not have a key.
Jones took the stand and testified that he first saw M.J. and Billy on the Saturday morning of the Father's Day weekend and that he later took M.J. to see his girlfriend. He and M.J. first went to her daughter's trailer. They later left the trailer for his girlfriend's apartment and stopped at the park on the way. Jones denied that he had molested M.J. Jones did not believe that M.J. was making the story up, but believed that her mother was putting the ideas in her head.
After the testimony of James Randall, the defense rested. The jury was instructed as to the law and were allowed to deliberate on the evidence. The jury found Jones guilty of sexual battery. A sentencing hearing was held on July 21, 1989, at which time there was also argument on a motion for judgment notwithstanding the verdict and/or new trial. The trial court denied the motions and sentenced Jones to 30 years with 20 years to serve in the custody of the Mississippi Department of Corrections, 10 years suspended. Jones was given five years of supervised probation upon his discharge from the Department of Corrections.
Jones appeals to this Court.

III.

A. WHETHER THE TRIAL COURT HAD VENUE.
The local jurisdiction of all offenses, unless otherwise provided by law, shall be in the county where committed. Miss. Code Ann. § 99-11-3 (Supp. 1991). Jones challenges the sufficiency of the proof of venue and argues that the state failed to prove that the crime took place in Lauderdale County.
Venue is an indispensable part of a criminal trial and it may be proved by direct or circumstantial evidence. Griffin v. State, 381 So.2d 155, 158 (Miss. 1980); Cf. Fairchild v. State, 459 So.2d 793, 799 (Miss. 1984) ("may be proved by circumstantial evidence or inferentially."). In this case, all of the witnesses who testified about Jones' movements with his daughter indicated that these took place in Lauderdale County. There is no indication of Jones having left Lauderdale County at any time with M.J.. The evidence was sufficient to establish Lauderdale County as the venue for Jones' trial.
This assignment is without merit.

B. THE TRIAL COURT ERRED IN ALLOWING THE JURY TO HEAR AND CONSIDER HEARSAY EVIDENCE.
Hearsay is not admissible. M.R.E. 802. Jones contends that the trial court allowed the state to "stack hearsay evidence upon hearsay evidence upon hearsay evidence" to bolster M.J.'s testimony. He points to the testimony of Dr. Hampton, Deputy Fowler, and Kathy Booth. Dr. Hampton testified as to what M.J. told her happened and who did it during her examinations. She also stated that it was her opinion that M.J. was telling the truth. Deputy Fowler related how M.J. demonstrated with dolls what happened to her. Booth discovered M.J. with her son and testified at trial that afterward M.J. told her that her "real daddy, Mike Jones" showed her how to do those things and that he put his finger in her "poo-poo." These will be considered separately.

1. Testimony of Dr. Harriet Hampton
At trial Dr. Hampton was asked what M.J. told her about what happened. Counsel for Jones objected to the answer *1056 as hearsay. Dr. Hampton was allowed to answer the question and she stated that M.J. indicated to her that her daddy had touched her vaginal region and that she had sucked "Dad's drooper." Dr. Hampton was then asked whether she had formed an opinion concerning whether abused children tell the truth about what happened to them. Counsel for Jones objected. The trial court allowed Dr. Hampton to answer the question. Dr. Hampton answered the question, "Yes."
Dr. Hampton's testifying as to what M.J. told her is clearly hearsay. M.R.E. 801(c). Such a statement is inadmissible unless it fits within one of the hearsay exceptions. There is no indication in the record of the basis for the admission of the statements by Dr. Hampton, but the only applicable exception is 803(4). This exception states:
(4) Statements for Purposes of Medical Diagnosis or Treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
M.R.E. 803(4) (as it read at the time of trial).
This exception generally admits statements of causation and fault but has been expanded to include the identity of the perpetrator in child abuse cases. Robert P. Mosteller, Child Abuse and Statements for the Purpose of Medical Diagnosis or Treatment, 67 North Carolina Law Review 257, 264 (1989). This was noted by this Court in Mitchell v. State, 539 So.2d 1366 (Miss. 1989), where it was stated:
many courts, State and Federal, with evidence rules similar to ours, admit statements by child sexual abuse victims to physicians and psychologists while being examined, diagnosed, and treated following an incident of sexual abuse under exceptions analogous to M.R.E. 803(4). However, for the most part, physicians and psychologists have been allowed to testify only about the incident, as related by the child, and not about the identity of the assailant is reasonably pertinent to treatment, such as in cases where the child has been sexually assaulted by a member of the family. In such cases, the need to remove the child from the situation becomes a pertinent part of the treatment. See, e.g., Morgan v. Foretich, 846 F.2d 941 (4th Cir.1988); United States v. Renville, 779 F.2d 430 (8th Cir.1985); U.S. v. Iron Shell, 633 F.2d 77 (8th Cir.1980); U.S. v. Nick, 604 F.2d 1199 (9th Cir.1979); State v. Robinson, 153 Ariz. 191, 735 P.2d 801 (1987). See also, Hall v. State, 539 So.2d 1338 (Miss. 1989).
Mitchell v. State, 539 So.2d at 1370.
There is a two-part test for admitting hearsay statements under 803(4). First, the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment. U.S. v. Renville, 779 F.2d 430, 436 (8th Cir.1985). M.J.'s statements to Dr. Hampton were made during the examination to determine whether M.J. had been abused. Dr. Hampton asked M.J. questions of her medical history which is consistent with promoting treatment. Dr. Hampton stated that a general medical history is important as well as what the allegations of abuse were. Dr. Hampton had found from her physical examination that M.J.'s hymen had been torn and had some scarring. These findings were consistent with M.J.'s statements. M.J.'s statements about what happened to her fit within the exception.
However, M.J. did not simply indicate to Dr. Hampton what had happened to her but also identified who did it. Statements concerning who committed the act seldom sufficiently relate to the diagnosis or treatment. U.S. v. Iron Shell, 633 F.2d 77, 84 (8th Cir.1980). However, as stated above, statements by a child abuse victim that the abuser is a member of the victim's immediate household are reasonably pertinent to treatment, as treatment encompasses treating emotional and psychological injuries *1057 and is also relevant to prevention. U.S. v. Renville, 779 F.2d at 436-437.
Jones, though M.J.'s natural father, was not a member of M.J.'s immediate household. He only saw M.J. during infrequent visitation. Does this make the expansive reading of 803(4) applicable to M.J.'s identification of him as the perpetrator? Renville expanded the exception to include identification of the perpetrator if in the immediate household in child abuse cases on the principles that such cases involve more than physical injury, as the physician must be attentive to treating the emotional and psychological injuries which accompany the crime because of the identity of the abuser. Physicians also have an obligation to prevent an abused child from being returned to the abusive environment. The obligation is most immediate when the abuser is a member of the victim's immediate household. It was believed then that statements of identity to a physician by a child sexually abused by a family member are of a type physicians reasonably rely on in composing diagnosis and course of treatment. U.S. v. Renville, 779 F.2d at 437, 438.
Though Jones was recognized by M.J. as her "real daddy," he was not a member of M.J.'s immediate household. Jones only exercised infrequent visitation with M.J. The concerns expressed in Renville, the treatment of emotional and psychological injuries, and preventing further abuse, are not as immediate in this case for those reasons. The identity of the perpetrator was not pertinent to the treatment of M.J. Therefore, this circumstance does not fall within the expansive reading of 803(4). Under these facts, the statements to Dr. Hampton identifying the perpetrator were inadmissible under the medical diagnosis and treatment and error.
However, a review of the record reveals that the admission of this testimony does not provide grounds for reversal. The record shows that M.J. identified Jones as the perpetrator and that Kathy Booth testified, without objection, that M.J. identified Jones to her as the perpetrator. In light of these identifications of Jones as the perpetrator, the admission of Dr. Hampton's testimony is merely cumulative. It told the jury nothing that M.J. and Kathy Booth did not also tell them. The error is harmless. M.R.E. 103(a).
Jones also argues that the trial court erred in allowing Dr. Hampton to comment on the truthfulness of M.J.'s testimony. The following is the testimony of Dr. Hampton's that is at issue:
Q. Have you formed an opinion over the years concerning whether children that come in with this kind of problem tell the truth about what happened to them?
BY MR. BROWN: Your Honor, I object to that.
BY THE COURT: I'll let her answer that yes or no.
A. Children do not fantasize about experiences that they have not encountered.
BY MR. BROWN: I object to the answer as being 
BY THE COURT: Sustained.
BY MR. BROWN:  opposed to the Court's ruling.
BY THE COURT: Sustained.
BY MR. MITCHELL: I think the Court ruled that you could answer the question in a yes or no answer.
A. Would you repeat the question?
Q. From your experience of examining children like [M.J.] who have evidence that they have been sexually abused, is your experience that they tell the truth?
A. Yes.
Q. Did you form an opinion in this particular case as to whether [M.J.] had been sexually abused?
A. Physical findings support the history of vaginal manipulation.
Jones contends that this testimony was an impermissible comment on truthfulness, or improper bolstering. In Williams v. State, 539 So.2d 1049 (Miss. 1989), we noted that opinion testimony as to a witness' truthfulness is of "dubious competency." Id. at 1051. In Goodson v. State, 566 So.2d 1142 (Miss. 1990), we said there is no *1058 reason to believe an expert's opinion as to the truthfulness of a child is any more admissible than the results of a lie detector test, and noted that a majority of courts preclude such testimony. Id. at 1153; Compare, Griffith v. State, 584 So.2d 383, 386 (Miss. 1991); House v. State, 445 So.2d 815, 822 (Miss. 1984) (involved a hypnotist's opinion concerning the accused truthfulness).
To the extent that Dr. Hampton's testimony may have been an opinion of M.J.'s truthfulness, allowing it was error. There is a further problem with Dr. Hampton's opinion testimony. It lacked relevancy in the form in which it was given. The initial question asked generally whether sexually abused children, not M.J. specifically, tell the truth about what happened to them. Dr. Hampton's answer was just as broad as the question and did not deal with M.J. specifically. The trial court restricted Dr. Hampton to a yes or no answer and she answered yes to a general question. Whether children generally tell the truth or not about sexual abuse is not relevant as to whether M.J. told the truth about what happened to her, as it does not make it more probable or less probable that M.J. was telling the truth. See, M.R.E. 401. The one question that dealt specifically with M.J. was not whether M.J. was telling the truth but whether Dr. Hampton had an opinion as to whether M.J. was sexually abused. Dr. Hampton responded that the physical evidence indicated vaginal manipulation. Both the question and the answer were proper.
The testimony of Dr. Hampton was not relevant, as it was not connected to M.J. Compare, West v. State, 553 So.2d 8, 20 (Miss. 1989) (expert gave "free floating lecture on necrophilia" without connecting it to the accused). Realistically, Dr. Hampton's opinion implied an opinion of M.J.'s truthfulness and in this it was error as well. On the other hand, the opinion in the form of a single word, "Yes," and read in context does not strike us as particularly potent. The admission of this testimony was error, but it was harmless error, as no substantial right of Jones was affected. M.R.E. 103(a).

2. Testimony of Deputy Chuck Fowler
Jones contends that the trial court erred in admitting the testimony of Deputy Fowler as the testimony was hearsay. Jones submits that the testimony was admitted over his objection. However, counsel for Jones moved to exclude the testimony of Deputy Fowler on the ground that he was not provided with statutory notice of the testimony, and not because of hearsay. The record does not show that Jones at any time objected to the testimony of Deputy Fowler on the basis of hearsay.
Jones raises an error on appeal different from that raised at the trial level. A defendant is procedurally barred from raising an objection on appeal that is different than that raised at trial. Willie v. State, 585 So.2d 660, 671 (Miss. 1991); Thornhill v. State, 561 So.2d 1025, 1029 (Miss. 1989). A trial judge will not be found in error on a matter not presented to him for decision. Crenshaw v. State, 520 So.2d 131, 134 (Miss. 1988); Ponder v. State, 335 So.2d 885, 886 (Miss. 1976); Howard v. State, 507 So.2d 58, 63 (Miss. 1987).
This issue is not properly before this Court.

3. Testimony of Kathy Booth
Kathy Booth was called as a witness during Jones' case in chief. During the state's cross-examination, Booth was asked what M.J. said in explanation of being found with Bubba's penis in her mouth. Jones objected and the trial court overruled the objection as excepted from the hearsay rule as an excited utterance under M.R.E. 803(2).
M.R.E. 803(2) provides:
The following are not excluded by the hearsay rule, even thought the declarant is available as a witness:
* * * * * *
(2) Excited Utterances. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
*1059 Jones contends that Booth's testimony does not fit within the exception as the statement made by M.J. was not triggered by the offense, which happened three days before, but by being caught by Booth with her playmate's penis in her mouth. Jones also contends that the statement was not really an excited utterance as contemplated by the rule, because a period of time passed between the incident and when M.J. began to talk.
A detailed discussion of whether the statement is excepted from the prohibition against hearsay is not necessary, as the statement may be categorized as non-hearsay under Rule 801. That rule states:
(d) Statements Which are not Hearsay: A statement is not hearsay if:
(1) Prior Statements by Witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive ...
* * * * * *
M.R.E. 801(d)(1)(B).
Under this rule corroborative testimony subsequent to the impeachment of the victim's testimony has been allowed. See, Hosford v. State, 560 So.2d 163, 167 (Miss. 1990) From examining the record of this case, counsel for Jones implied during its cross-examination of M.J. that the incident and M.J.'s testimony was the result of a "bad dream" and that the incident never actually occurred. It was also implied that M.J.'s testimony was influenced by her mother. In light of these efforts to impeach M.J.'s testimony, as being the result of a dream or influence from her mother, the testimony of Kathy Booth was corroborative of M.J.'s testimony and rebutted the implication that the incident was a "bad dream" or never happened. As such the testimony was non-hearsay and admissible.
This assignment is without merit.

C. THE TRIAL COURT ERRED IN ALLOWING THE STATE TO EXCESSIVELY LEAD THE CHILD WITNESS.
At trial M.J. was examined by the state. The examination was very brief and was primarily for the purpose of allowing M.J. to demonstrate with the dolls what happened to her. A majority of the questions used during the examination were leading questions. Jones contends that the use of leading questions by the state during M.J.'s testimony was so excessive that it amounted to the state's testifying and that the trial court abused its discretion in allowing the leading.
Leading questions should not be used on direct examination of a witness except as may be necessary to develop his testimony. M.R.E. 611(c). The classic example for allowing the use of leading questions is where a child is a witness. Ivy v. State, 522 So.2d 740, 742 (Miss. 1988). A trial court, in its discretion, may allow leading questions, and unless there has been an abuse of discretion to the prejudice of a complaining party, it is not reversible error. Palmer v. State, 427 So.2d 111, 115 (Miss. 1983); Whitlock v. State, 419 So.2d 200, 203 (Miss. 1982); Accord, Ivy v. State, 522 So.2d at 742.
Considering the examination of M.J. in its entirety, the leading questions were only used to develop M.J.'s testimony and set the stage for the demonstration with the dolls. In light of the child's age, the leading questions were by no means excessive. The trial court did not abuse its discretion in allowing the state to use leading questions.
This assignment is without merit.

D. THE TRIAL COURT ERRED IN REFUSING TO GRANT DEFENDANT'S INSTRUCTION D-5.
Jones offered as one of his instructions to the jury instruction D-5. This instruction stated:
The Court instructs the jury that the testimony of [M.J.] should be weighed with great caution and the jury may disbelieve such testimony all together if *1060 you believe it untrue, the jury being the sole judge of the credibility of the witness.
The trial court refused the instruction, equating the instruction with those given for a co-conspirator or co-defendant.
Jones contends that the refusal of D-5 was error, because M.J.'s testimony, due to her young age, should not have been "thrown at the jury" without proper instruction. He argues that the court may make the jury aware of the dangers of the testimony of a child of tender years. He submits that his instruction should have been given to inform the jury of the law applicable to the testimony of children of tender years.
This Court has addressed this issue before in Bandy v. State, 495 So.2d 486 (Miss. 1986), and stated:
Furthermore, the language of the instruction, in telling the jury to view L.H.'s testimony "with great caution," sets out the same standard given to the jury for evaluating the testimony of accomplices and co-defendants. The instruction is given in those cases because of the inherent mistrust of those witnesses' veracity. That it is not necessarily the case with a child witness. In that case, it is not presumed that the child may be dishonest, but may simply that he or she may not have the capacity to understand sufficiently or remember correctly the events to which he or she is testifying. A child's testimony should not be viewed with a jaundiced eye as to whether or not the child is truthful  a child may be presumed to be as truthful as any other witness. If the jury is to be instructed at all with respect to the testimony of a child, it should be told to view the testimony in the light of the child's age and understanding, not his veracity. We hold, then, that it was not error to refuse this instruction.
Bandy, 495 So.2d at 493.
The instruction in Bandy was apparently rejected because it instructed the jury to receive the child's testimony with caution and amounted to a comment on the child's veracity. We did not prohibit instructions on the child's testimony, as an instruction that informs the jury to view the child's testimony in the light of the child's age and understanding is allowable. However, instructions that tend to comment on the truthfulness of the child's testimony should be rejected. See, Ivy v. State, 522 So.2d at 743.
Instruction D-5 instructed the jury to weigh M.J.'s testimony with great caution. From the trial judge's comments he felt that the instruction, associating it with an instruction for co-conspirators or co-defendants, commented on M.J.'s veracity. The trial judge felt that the instruction went beyond a mere caution. The refusal of this type of instruction is not error. Bandy, 495 So.2d at 493.
This assignment is without merit.

E. THE TRIAL COURT ERRED IN OVERRULING THE MOTION FOR DIRECTED VERDICT AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND/OR A NEW TRIAL.
After the state rested, Jones moved for a directed verdict. The trial court denied the motion and Jones proceeded to present his case. At the close of all evidence Jones did not renew his motion for directed verdict, however, he did submit a peremptory instruction that was refused by the trial court. Jones now contends that the trial court erred in denying his motion for directed verdict and motion for judgment notwithstanding the verdict and/or new trial.
This assignment challenges the sufficiency and the weight of the evidence. When considering a motion for a directed verdict, or judgment notwithstanding the verdict this Court must consider all of the evidence in the light most favorable to the State, accepting all evidence introduced by the State as true, together with all reasonable inferences therefrom. If there is "substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have *1061 reached different conclusions, we may not disturb the verdict of guilty." McGee v. State, 569 So.2d 1191, 1194 (Miss. 1990); Barnwell v. State, 567 So.2d 215, 217 (Miss. 1990); Davis v. State, 530 So.2d 694, 703 (Miss. 1988). A motion for a new trial is discretionary with the trial judge and this Court will not order a new trial unless it is convinced that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. Veal v. State, 585 So.2d 693, 695 (Miss. 1991); Gibson v. State, 580 So.2d 739, 741 (Miss. 1991); Lane v. State, 562 So.2d 1235, 1236-37 (Miss. 1990).
There was evidence that something did indeed happen to M.J.. Booth discovered M.J. with her son's penis in her mouth. When asked where she learned it, M.J. stated that her "real daddy, Mike Jones" taught her. Deputy Fowler testified that M.J. demonstrated with dolls what happened to her and again indicated that it was Jones who did it. At trial M.J. again demonstrated what happened to her and stated that Jones did those things to her. Dr. Hampton's physical examination of M.J. was consistent with vaginal manipulation, though she could not testify as to how old the scars were.
Jones had infrequent visits with his daughter and son, but he did visit with them the Father's Day weekend before the incident with Booth's son. During that weekend, Jones spent much of it around other people. However, he and M.J. did leave to go and visit his girlfriend. It was indicated that Jones and M.J. were alone for at least 40 minutes. Jones denied molesting M.J. and stated that he would be a murderer first.
There was an indication that M.J.'s stepfather had previous history as a child molester. There was also an indication of an alleged molestation of M.J. at school and that Elaine did not report it.
Considering all of the evidence of this case in the light most favorable to the verdict, there is substantial evidence of such quality that reasonable jurors might have reached a different conclusion. The jury obviously did not believe Jones. The overwhelming weight of the evidence does not contradict the verdict. The trial court did not err in denying the motions for directed verdict and for a judgment notwithstanding the verdict or new trial.
This assignment is without merit.
CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH TEN (10) YEARS SUSPENDED AND FIVE (5) YEARS ON PROBATION UNDER THE SUPERVISION OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.
ROY NOBLE LEE, C.J., PRATHER, ROBERTSON, PITTMAN, BANKS and McRAE, JJ., concur.
HAWKINS, P.J., concurs in result only.
DAN M. LEE, P.J., not participating.