643 So.2d 512 (1994)
George Homer HEFLIN
v.
STATE of Mississippi.
No. 90-KA-00388.
Supreme Court of Mississippi.
September 29, 1994.
*513 David L. Valentine, Wood & Valentine, Ridgeland, for appellant.
Michael C. Moore, Atty. Gen., Pat S. Flynn, Asst. Atty. Gen., Jackson, for appellee.
En Banc.
BANKS, Justice, for the Court:

ON PETITION FOR REHEARING
On Petition for Rehearing the original decision is withdrawn and this opinion substituted therefor. We are once again asked to review the proceedings leading to the conviction of George Homer Heflin of the crime of rape of his daughter. We reversed the judgment following the first trial because of the exclusion of testimony that the victim had discussed setting up a person for rape. After careful study, we are once again constrained to hold that Heflin was deprived of a fair trial due to the wrongful exclusion of evidence indicating that victim may have had recent sexual activity providing an alternate source for some of the physical evidence found. We reverse and remand for further proceedings.

I
On June 11, 1985, Homer Heflin and his then 16-year-old daughter, S.H. (the name of the alleged victim is omitted to protect her identity), went to a sandbar on the Pearl River for a day of fishing and sunbathing. In addition to the ordinary supplies needed for such excursions (suntan lotion, insect repellent, a fishing pole, etc.), Homer Heflin also took along a bottle of vodka and stopped *514 to get another one on the way. He also had a cooler of beer and wine in his vehicle.
After they got to the sandbar, S.H. sunbathed while her father fished and drank. After fishing for a little while, Heflin began to gather firewood. According to Heflin, he and his daughter entered into a conversation about purchasing S.H. a new car. This conversation ended in an argument. During this argument, Heflin admits to slapping the victim. It then started raining, and the two of them took shelter in the vehicle. They tried to leave the sandbar but the dune buggy they were travelling in would not start. Heflin, a mechanic, explained that it was because the distributor cap had gotten wet. After the rain stopped, he built a fire on the sand to dry out the distributor cap and S.H. went to sleep. It is at this point that the stories of the parties begin to differ.
According to Homer Heflin, when the distributor cap dried out he put it on the distributor and the two of them immediately went home, stopping only at a convenience store to pick up some supplies for dinner. According to S.H., when she awoke, her father started accusing her of smoking, drinking and having sex with boys. He said he had heard that she was "South Jackson's road whore." S.H. stated that he told her "if I was going to fuck everybody else in the country I was him, too." S.H. testified he then got on top of her and when she fought, he hit her on the side of the head five or six times, bursting her lip. He then raped her. After the two of them had washed off in the river, S.H. tried to escape by running away but Heflin caught her and choked her. He then raped her again. He told her, "Now that wasn't so bad, was it?" Heflin next gathered their things up and put them in the dune buggy. However, before they left the sandbar, he raped S.H. a third time.
At this point the stories of the parties again become similar. They returned home. S.H. stayed there the rest of the evening, in the presence of her father, her stepmother Linda Heflin, and Mike Henderson, a friend of her father. The next morning when her stepmother went to work, S.H. called her sister, Deniece McClure, told her that something had happened, and asked her to come pick her up at her place of work that afternoon. When her sister arrived, S.H. told her what had happened and the two of them went to their mother's house and then to the police.
In addition to S.H.'s testimony and her sister's, the State presented the testimony of Dr. C.E. Grissom, who testified that when he examined S.H. she had bruises on her left temple, and strangulation marks on her throat. Dr. Grissom did a rape kit and found no sperm in the vaginal vault, but testified that the thirty-hour time period between the rape and the examination made it unlikely that sperm would be found. He also testified that due to the length of time between the assault and the examination he could not determine whether or not S.H. had recent sexual intercourse. However, Dr. Grissom testified that in his opinion, based on his experience with hundreds of rape victims, S.H. had been raped. This testimony was based solely upon her demeanor and the presence of the bruises.
Jackson police detective Edna Drake testified that when she interviewed S.H., she had bruises on the left side of her face, marks on her throat and a split upper lip. She also said S.H. cried a lot when she was telling her what had happened at the sandbar. With a search warrant, Detective Drake got the clothing that S.H. and her father had worn to the sandbar. Detective Drake's testimony was also used to establish venue in the matter.
Debra Butler, a forensic serologist, tested the bathing suit S.H. was wearing and found sperm cells and seminal fluid in the crotch area. Mrs. Butler testified, over numerous objections of the defense, that in her opinion S.H. had engaged in recent sexual intercourse.
Deniece McClure, the victim's sister, testified that when she picked S.H. up at work, as S.H. had called her and asked her to do, she noticed bruises on the victim's face and neck. Over defense objections, the sister testified that S.H. told her that she had been raped by her father.
As already discussed, Homer Heflin testified that he had slapped S.H. that day in an *515 argument over getting her a car, but said nothing else happened. Heflin denied ever having any sexual relations with his daughter whatsoever. His wife, Linda, and friend, Mike Henderson, testified that S.H. did not have any bruises when she came in from the fishing trip and that she acted normal through dinner and through the evening.
Shirley Brewer, Henderson's ex-wife and a friend of the Heflins, testified that at some time prior to June 1985, S.H. told her she knew how to set someone up in a rape case, that she had done research in the library (the trial court's refusal to let Brewer testify to this alleged conversation with S.H. was the basis of this Court's reversal of Heflin's first conviction). On rebuttal, S.H. testified that she was never close to Shirley Brewer, had never had this conversation with Shirley Brewer and had never shared any secrets with her. Hinds County Circuit Clerk Barbara Dunn testified that although this case had been set for trial ten (10) times before the first trial in 1987, Brewer had not been subpoenaed as a witness any of those times.
At the close of all the evidence, a verdict of guilty was returned against Homer Heflin. Heflin was sentenced to 25 years in prison and this appeal followed. He raises the following issues:
I. The trial court erred in overruling the defendant's motion to dismiss based upon the loss of crucial pieces of exculpatory evidence and in allowing Debra Butler to testify regarding serology testing from the "rape kit" after it had been lost or destroyed.
II. The trial court erred in overruling the defendant's motion for mistrial based upon the testimony of Debra Butler regarding her opinion that S.H. had recently engaged in sexual intercourse.
III. The trial court erred in not allowing the testimony of the defendant, George Homer Heflin, regarding statements made by Emily Thomas regarding the reasons S.H. came to live with, George Homer Heflin.
IV. The trial court erred in not allowing the impeachment of the complaining witness, S.H., with her prior testimony regarding lying to the appellant.
V. The trial court erred in refusing to allow testimony of S.H.'s prior sexual activity as contained in the emergency room reports of Dr. C.E. Grissom and the blood tests of her boyfriend, Greg Dukes, at the time of the alleged rape.
VI. The trial court erred in allowing the hearsay testimony of Deniece McClure regarding statements made by the complaining witness, S.H., regarding who had allegedly raped her.
VII. The trial court erred in taking judicial notice of the fact that the alleged crime took place in the First Judicial District of Hinds County, Mississippi.
We have carefully examined all issues raised. We find IV, V, and VI worthy of discussion by the Court, and cause for reversal with respect to issue V.

II
Prior to trial the state sought a ruling precluding evidence of S.H.'s past sexual behavior, asserting the provisions of M.R.E. 412. In response to that motion Heflin made an offer of proof, in accordance with MRE 412(c) contending that certain evidence was admissible under MRE 412(b)(2)(A) because it went to the question of whether he was the source of the semen revealed in examination of S.H.'s bathing suit. The court granted the motion in limine. Heflin renewed his motion at trial and we consider the evidence adduced in the motion hearing and that adduced at trial supporting the admissibility of this evidence.
The evidence in question consisted of the medical history taken by the examining physician, the testimony of Mrs. Heflin concerning the activities of S.H. on the weekend before the alleged rape and the evidence of the blood type of the young man, Greg, who she described as her boyfriend, with whom S.H. went out on the Saturday and Sunday before the rape. The medical history reflected that S.H. told the doctor that she had last had sexual intercourse "last week" when she was examined by the physician on Wednesday, June 12, following the alleged *516 rape on Tuesday. Linda Heflin offered testimony that S.H. went out with Greg on Saturday, June 8, in the early evening and returned at midnight and that she went out with Greg again on Sunday, June 9, in the early afternoon and again returned at or near midnight. Mrs. Heflin further testified that S.H. was wearing the same bathing suit on Sunday as that upon which the seminal fluid in question was found. The evidence of Greg's blood type would have revealed that he shared the type of Homer Heflin, and, therefore could have been the source of the sperm.
The physician was unable to be more specific than the "last week" recorded in the notes and it is, therefore, unclear whether the reference could have been to the previous Saturday or even Sunday.
There was testimony from a forensic chemist to the effect that, as a rule of thumb, intact sperm could be found as late as 72 hours after intercourse. The testimony was that 72 hours was a "rough estimate," however, and the suggestion that intact nonmotile sperm could be found after a longer period, even up to fourteen days, was not deemed an impossibility, depending upon how the clothing upon which they were deposited was packaged. The clothing here had been packaged in a plastic bag and examined on Friday, June 14, possibly as early as 8:00 a.m., approximately 105 hours after the victim was last with Greg.
S.H. and Greg offered testimony that they had not, in fact, had sexual intercourse until several months after this incident and S.H. testified, in contradiction to what was recorded in her medical history, that she had last had intercourse prior to the alleged rape in January 1985.
The trial court ruled that Heflin had not shown sufficient relevance for admissibility under the act. It erred. The state offered evidence that seminal fluid was discovered on the bathing suit, and that it was of a blood type consistent with Heflin's (as well as 68 percent of the male population). Clearly, the evidence here in question was admissible to rebut the inference that Heflin was the source of the semen discovered and that the semen was the result of a rape. Goodson v. State, 566 So.2d 1142, 1152 (Miss. 1990) (Evidence to the effect that child victim's hymen was not intact justifies admission of evidence of prior sexual conduct to show that accused was not the cause thereof).
While it is true that evidence of Greg's blood type was offered and rejected in the first trial without adverse comment by this Court on appeal, the evidence before the court at that time was insufficient to demonstrate its relevance. In the hearing on the motions prior to the second trial and at the second trial, evidence of the medical history and the testimony of Mrs. Heflin met the relevance threshold and carried with it the evidence of Greg's blood type.
In a case such as this, largely consisting of a credibility choice between Homer and S.H., we cannot say that the exclusion of this evidence was harmless. Nor can we say that this evidence is more unfairly prejudicial than probative. It follows that we must reverse.[1]

III
Because this case must be retried, we discuss two other hotly contested evidentiary issues. We add a note of caution, however, that these issues are discussed based on the record now before us. The trial court will have to give due regard to any changes in circumstances when these issues arise in future proceedings.

a.

IV. THE TRIAL COURT ERRED IN NOT ALLOWING THE IMPEACHMENT OF THE COMPLAINING WITNESS WITH HER PRIOR TESTIMONY *517 REGARDING LYING TO THE APPELLANT.
On direct examination, in recounting the events of June 11, 1985, S.H. testified that after repeated badgering from her father she told her father that she was a virgin. S.H. testified:
We just laid there for awhile. And  and then I remember it started raining. And we got our stuff together and went in the woods. And we had put it all on the dune buggy. And I  I thought we were going to leave. And then he went to crank the dune buggy and it wouldn't crank. And he said that the distributor cap had gotten wet and it would take a couple of hours before it would dry. And so we went and got all the stuff off the dune buggy and went to another part of the sand bar. And I had left the chair. When it started raining, I left the chair. So I just laid my  my blanket out and I  I laid on that. And it was still some misting rain. And I was cold, so I wrapped up in my blanket. And he was building a fire. And I remember dozing back and forth to sleep. And seems like he was fishing some more, I don't really remember. And then I woke up from dozing off and laid my blanket back out and instead of being wrapped up in it. And he started talking about just  he started talking about how he knew I was smoking cigarettes. And I told him I wasn't smoking cigarettes, and told him  I was dating a boy named Greg ____ at the time. And he said every time I'd come in from going out with Greg I had cigarette breath and cigarette smell on my breath. And he said he knew I was still drinking. And  and just started accusing me of a lot of things that I hadn't been doing, And, you know, I tried to explain to him that, you know, I hadn't been doing any of those things. And he just kept on and on, and said that  asked me if I was a virgin, and I told him I was. And he said that that's not what he had heard, that  said he had heard that I was South Jackson's road whore. (emphasis added).
Heflin claims that this testimony was in direct conflict with previous sworn testimony of S.H. in which she testified that she was not a virgin. He contends that this testimony "opened the door" for the defense to cross-examine on this issue.
The State argues that this line of questioning was merely a "back-door" attempt at putting the victim's character in question. Consequently, the State contends that the trial court properly prohibited cross-examination on this issue.
Mississippi Rule of Evidence 611(b) states:
(b) Scope of Cross-Examination. Cross-examination shall not be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.
Mississippi Rule of Evidence 613 states:
(a) Examining Witness Concerning Prior or Statement. In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel.
(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).
The rules allow an attorney wide latitude on cross-examination and entitlement to cross-examine a witness as to a prior inconsistent statement. Rule 611 also tells us that the court should exercise reasonable control over the presentation of evidence to promote attaining the truth and to "protect witnesses from harassment or undue embarrassment."
The rule does not allow cross-examination on any matter affecting the credibility of the witness, without restraints. This privilege extends cross-examination only to any matter that is relevant. White v. State, 532 So.2d 1207, 1217 (Miss. 1988) ("[A] witness may only be impeached on a statement which embodies `a fact substantive in its nature and *518 relevant to the issue made in the case.'") See Williams v. State, 73 Miss. 820, 824, 19 So. 826, 827 (1895); Cooper v. State Farm Fire & Cas. Co., 568 So.2d 687, 691 (Miss. 1990) ("[I]mpeachment with prior inconsistent out-of-court statements is proper `so long as the statement made in court is one relevant to the issue in the case and therefore not collateral.'")
In Sayles v. State, 552 So.2d 1383, 1386 (Miss. 1989), the Court said:
[Defendant] was entitled to full and adequate cross-examination of Elbert. However, cross-examination on an irrelevant point is not permitted. The scope of cross-examination though ordinarily broad, is within the sound discretion of the trial court and the trial court possesses inherent power to limit cross-examination to relevant matters. Pace v. State, 473 So.2d 167 (Miss. 1985); Dozier v. State, 257 So.2d 857 (Miss. 1972).
Whether the victim was a virgin was irrelevant to whether she was raped. Goodson v. State, 566 So.2d 1142, 1148 (Miss. 1990). Moreover, her testimony was not that she was a virgin but that, under relentless pressure from her father, she told him that she was a virgin. This was done at a time and under circumstances, according to her, when she had reason to be afraid to give any other answer.
Not only does the broad latitude allowed in cross-examination not extend to irrelevant matters, it is particularly problematic when the proposed questions involve the victim's prior sexual conduct. The State correctly argues that this proposed line of questioning was properly excluded based on Rule 412(b). The trial court had previously granted the State's motion in limine to exclude any such evidence under this rule. While it erred with respect to some of the proposed testimony as indicated hereinabove, Rule 412(b) excludes evidence of the prior sexual conduct of the victim unless that conduct is relevant to a specific issue. The victim's virginity is not relevant.

b.

VI. THE TRIAL COURT ERRED IN ALLOWING THE HEARSAY TESTIMONY OF DENIECE MCCLURE REGARDING STATEMENTS MADE BY THE COMPLAINING WITNESS, S.H., REGARDING WHO HAD ALLEGEDLY RAPED HER.
Deniece McClure, the sister of the victim, testified that the day after the alleged assault S.H. called McClure, told McClure that something had happened, and asked McClure to pick her up at work. McClure went to S.H.'s place of employment as she had been requested to do. She described the meeting:
A. I went inside at the register. And she was standing there at the register, waiting on her customers, crying with her face all beat up. And I just asked her through the line what was the matter. And she asked her supervisor if she could leave, and that's when we left.
Q. Okay, Did she leave right away?
A. Right after she  right. As soon as her supervisor told her she could go on and go.
Q. Okay. And what was she doing when you got there?
A. Waiting on customers.
Q. Okay. And describe her emotional condition when you saw her.
A. Well, when I saw her she was crying. And she had bruises around her neck and on her face.
Q. You were able to see the bruises?
A. Yes.
Q. Okay. What did you do after you talked to [S.H.]?
A. In the car we went  we drove to my mother's.
Q. Okay. All right. When you went to the store and talked to [S.H.], where did you  what did you do after you talked to her, immediately after you talked to her?
A. We went and got in the car. And then as we were leaving the parking lot, she just told me a little bit of what had happened. She just kind of screamed it out and told me. And we just sat there for a little while in the parking lot. And [S.H.] was crying. And I was just holding her, *519 listening to, you know, little things and she was saying that had happened.
Q. Okay. Then what?
A. Then we started on to go to my mother's. And several times we  we had to stop because [S.H.] just started crying real bad. So we stopped on the side of the road and just held her 
Q.  And where  I'm sorry 
A.  Yeah, we just 
Q.  Where did you stop?
A. Just this side of the interstate. Just pulled over.
Q. On the interstate?
A. Um-hum.
Q. And why did you do that?
A. I just wanted to hold her. She was just crying, telling me little things that had happened. And I just pulled over.
Q. How long did you sit there after you pulled over because she was crying?
A. Maybe 15 minutes.
Q. Okay. And what did she say when you pulled over?
A. She just said, "My dad raped me."
Objection to this testimony was overruled by the trial judge and the testimony allowed as an "excited utterance" exception to the hearsay rule under Rule 803(2) of the Mississippi Rules of Evidence.
The statement to the sister was made less than 24 hours after the assault. It is undisputed that S.H. came in contact with several other people during this time. The victim and the defendant saw three of the defendant's friends at a convenience store and then returned home to have dinner with the defendant's wife. The victim also possibly made a phone call to her boyfriend that evening. The next morning, the victim went to work where she encountered co-workers and customers. She did not mention the rape until her sister came to see her later that morning. Admittedly, she had an opportunity to talk with Deniece by phone the next morning, but her father was also at home and she testified that she was afraid he would come into the room while she was talking. She told her sister very quickly that something had happened, asked her to come and get her at work, then hung up. She had an opportunity to talk with other adults when she arrived at work, but she knew her sister was coming to get her; there was no reason at that point for S.H. to go through the extreme embarrassment of telling this shameful story to anyone else.
The statement must be spontaneous and made while under the stress of the assault to qualify as an excited utterance. Evans v. State, 547 So.2d 38 (Miss. 1989). The defense argues that because of the time elapsed and the other people S.H. encountered that "the victim's statement cannot be called spontaneous." This ignores the very unique personal shame, embarrassment, and stress associated with rape, particularly of a child by a father. The people S.H. first encountered were the defendant's friends and wife. Her sister was the first person she encountered with whom she could share this information or, as phrased by the State, "the first reasonable opportunity for her to tell a responsible and caring adult what had happened to her."
The record clearly shows this to be the first opportunity for S.H. to talk face to face with someone whom she loved and trusted. As S.H. put it, "anything short of this would have been dangerous."
Rule 803(2) defines an excited utterance as "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The rule sets no time limit. It is not unreasonable that a sixteen-year-old victim was still under the stress of the event the morning after her father hit her repeatedly and raped her three times. The stress did not dissolve simply because she 1) encountered adults at a convenience store with whom she realistically could not speak because her father was present, 2) had a meal with her father, his wife and his friend, and 3) went to work the next morning. McClure's testimony was that when she picked up her sister, S.H. was crying. She felt compelled to pull off the interstate to comfort her sister for fifteen minutes.
In Davis v. State, 611 So.2d 906, 914 (Miss. 1992), this Court reiterated the principle that *520 the determination of the competency of an excited utterance is within the discretion of the trial court. In that case, the Court found no abuse of discretion where the trial judge allowed testimony by the victim's sister. See also Gill v. State, 485 So.2d 1047, 1050 (Miss. 1986).
Prior to the adoption of the Rules of Evidence, this Court approved the language of the Michigan Court of Appeals which stated that
(h)earsay testimony concerning the details of a complaint of sexual assault is admissible ... if her statement is shown to have been spontaneous and without indication of manufacture, and if any delay in making the complaint is excusable insofar as it is caused by fear and other equally effective circumstances. People v. Mikula, 84 Mich. App. 108, 116, 269 N.W.2d 195, 199 (1978). (emphasis added)
See Cunningham v. State, 467 So.2d 902, 905 (Miss. 1985); Williams v. State, 427 So.2d 100, 102-103 (Miss. 1983).
In the present case, any delay can be explained by circumstances immediately after the incident which effectively prevented S.H. from telling what happened until she got in her sister's car. That is, she had not before had the opportunity to confide face-to-face in a person in whom she had trust and outside the presence of her father.
Moreover, even though the statement was admitted under Rule 803(2), the statement also could be considered as not hearsay under Rule 801(d)(1). Rule 801(d)(1) provides that a statement is not hearsay if:
The declarant testified at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing or other proceeding, or in a deposition, or (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, or (C) one of identification of a person made after perceiving him.
McClure testified after S.H. The thrust of the extensive cross-examination of S.H. was an attempt to show that she had fabricated the story of the rape and that her motive was to get away from the strict discipline imposed by her father. McClure's testimony comes within the provision of Rule 801 which provides that such statements are not hearsay when offered to rebut a charge of recent fabrication or improper motive. Jones v. State, 606 So.2d 1051 (Miss. 1992)
Under either Rule 801(d)(1) or 803(2), the statement was admissible and the trial court made no error in overruling Heflin's objection.

IV
We hold that judgment of the court must be reversed for the reasons stated in part II of this opinion. We find no other error.
REVERSED AND REMANDED.
SULLIVAN, PITTMAN and McRAE, JJ., concur.
DAN M. LEE, P.J., concurs in result and dissents to part III.
SMITH, J., dissents with separate written opinion, joined by HAWKINS, C.J., PRATHER, P.J., and JAMES L. ROBERTS, Jr., J.
SMITH, Justice, concurring in part, dissenting in part:
I am firmly of the opinion that the issue on which the Court now wishes to reverse this case was correctly decided on the previous occasion that this issue was before this Court. See Heflin v. State, 539 So.2d 1056 (Miss. 1989) (Heflin I). I am also convinced that the original majority opinion in the case sub judice is correct as written. Neither this issue nor the defendant's proof has changed from the time of the Heflin I decision.
I concur with the majority regarding issues IV and VI. However, I cannot agree with their reasoning in issue V, therefore, I am compelled to dissent.
The majority now suggests that at the time of the Heflin I trial, the evidence before the lower court was insufficient to demonstrate *521 the relevance of the boyfriend's blood type. This Court then states: "In the hearing on the motions prior to the second trial and at the second trial, evidence of the medical history and the testimony of Mrs. Heflin met the relevance threshold and carried with it the evidence of Greg's blood type."
The majority suggests that the medical history taken by Dr. Grissom and the testimony of Linda Heflin were not considered by the first trial court or by this Court. A review of both trial records clearly indicates that is not what happened. Both Dr. Grissom's medical history of S.H. and testimony from Linda Heflin were considered previously by this Court in Heflin I.
As to the differences between the two trials, Heflin states the following in his brief:
At the 412 hearing held before Judge Bowling evidence was put forth almost identical to the previous testimony but with a few exceptions. First of all, Linda Heflin testified as to bruises on S.H.'s neck prior to the alleged incident of rape. Secondly, the testimony, Dr. Grissom and Debra Butler regarding the length of time within which intact sperm can be found on clothing increased by Mrs. Butler testing of upwards to one week if properly preserved and Dr. Grissom's testing of stretching 72 hours.
Dr. Grissom's medical history regarding S.H. was introduced as Exhibit 4 in Heflin's first trial. Both S.H. and Dr. Grissom were questioned outside the presence of the jury about the notation in the history that the doctor had recorded that S.H. indicated she had intercourse "last week." The court concluded that the testimony could not be introduced to the jury.
Linda Heflin, wife of the appellant, testified at the June 10, 1986, hearing on the 412 motion before Judge James D. Bell; during the Heflin I trial on February 11, 1987; at the motions hearing on July 17, 1989 before Judge Francis Bowling; and at the second trial during February 1990. As noted by Heflin's brief there were differences in her testimony from the Heflin I trial to the second trial. Heflin's brief claims Linda testified that she noticed "bruises on S.H.'s neck prior to the alleged incident of rape." However, what she actually testified to was that she saw a "hickey" or passion mark on S.H. This was contrary to her testimony in the Heflin I trial. On cross-examination the following testimony was brought out at the motion hearing prior to the second trial:
Q. Do you recall testifying at the prior trial under oath?
A. Yes, sir.
Q. Do you recall saying at that time that you saw no such mark?
A. I don't recall saying that. I know I didn't see anything the night that she came in that this allegedly happened.
Q. All right. Then let me remind you of your testimony. This is talking  this is on Page 281 of her testimony, starting at Line 25. "I was watching TV."
"Did you notice anything about  unusual about S.H.?"
"Answer: Nothing at all.
"Question: Did you see any bruise marks on her, any broken lip, or 
"No, sir.
" anything like that?
"No.
"What about S.H.'s neck? Did it have any marks on it?
"No, sir."
Linda Heflin could not explain the inconsistency between her testimony at the Heflin I trial and at the hearing conducted prior to the second trial.
The other difference noted by Heflin other than the questionable change in testimony by Linda Heflin was in the testimony of Debra Butler as to the time that evidence of seminal fluid could be detected in the swimming suit. She extended the time from forty-eight hours to upwards of seventy-two hours.
The majority notes that "the last clothing ... was examined on Friday, June 14, possibly as early as 8:00 a.m., approximately 105 hours after the victim was last with Greg." The majority is resorting to mere speculation to reach this figure of 105 hours. There is no indication in the record as to when on Friday the clothing was examined. While S.H. and Greg Dukes agree that they saw *522 each other sometime that weekend it is unclear as to whether it was Saturday, Sunday or both. In any event, both deny any sexual contact between the two of them prior to the rape by the appellant. This testimony is identical to their testimony in the Heflin I trial. There is no proof to the contrary as to their consistently stated lack of sexual contact. Concerning examination of the swimsuit, the figure of 105 hours is the lowest possible estimate and already well beyond the "rough estimate" of time that the forensic chemist, Debra Butler, testified that semen could be found.
In reaching the conclusion that the proposed evidence was not relevant, both trial courts correctly concluded that the allegations of possible sexual conduct did not fall within the exceptions set forth in Rule 412 and the Rape Shield Statute.
What this Court originally wrote in Heflin I, in an unpublished opinion, is still applicable. The Court wrote the following:
Prior to trial, the State filed a motion in limine to prevent the defense from introducing evidence or asking questions concerning the prior sexual conduct of S.H. with a third party. At the same time, the defense filed a motion to introduce evidence of specific past sexual conduct.
After hearing the evidence, or lack thereof, the judge granted the State's motion in limine and denied the defendant's motion. The defendant now contends that the trial court abused its discretion and commited [sic] reversible error by not allowing him to cross-examine S.H. in front of the jury on her past conduct with a young man whom she was dating. Heflin had full opportunity at the hearing to question S.H. and could produce no evidence of prior sexual activity with anyone during the time frame of this incident. The judge was correct in refusing to let the defense attorney victimize this young girl by going into embarrassing and totally irrelevant issues at trial. (emphasis added).
Mississippi's Rape Shield statute, § 97-3-70, Miss. Code Ann. (1972 as amended), and Rule 412, Mississippi Rules of Evidence, were adopted to prevent such harassment of rape victims. Prior to the adoption of Rule 412 of Mississippi Rules of Evidence, Mississippi had enacted the "Rape Shield Statute," § 97-3-70, Miss. Code Ann. The Rape Shield Statute provides in part that in any rape prosecution opinion evidence, reputation evidence and evidence of specific instances of the complaining witness's sexual conduct is not admissible by the defendant unless it "rebuts evidence introduced by the prosecutor which proves or tends to prove that the accused is the ... source of semen found in the victim... ." Miss. Code Ann. § 97-3-70(4) (Supp. 1988).
Rule 412 of the Mississippi Rules of Evidence provides in pertinent part:
(a) Notwithstanding any other provision of law, in a criminal case in which a person is accused of rape or of assault with intent to commit rape, reputation or opinion evidence of the past sexual behavior of an alleged victim of such rape or assault is not admissible.
(b) Notwithstanding any other provision of law, in a criminal case in which a person is accused of rape or of assault with intent to commit rape, evidence of a victim's past sexual behavior other than reputation or opinion evidence is:
(1) Admitted in accordance with subdivisions (c)(1) and (c)(2) hereof and is constitutionally required to be admitted; or
(2) Admitted in accordance with subdivision (c) hereof and is evidence of
(A) Past sexual behavior with persons other than the accused, offered by the accused upon the issue of whether the accused was or was not, with respect to the alleged victim, the source of semen or injury ...
Comment (b) to Rule 412 states:
Section (b) excludes other evidence of her past sexual experience with some exceptions. Specific instances of sexual conduct are admissible to determine whether the defendant is the source of semen or injury. Furthermore, specific instances of sexual conduct between the alleged victim and the defendant are relevant on the issue of consent.
*523 (Emphasis added).
The defendant had no evidence of any specific instances of sexual conduct between S.H. and her boyfriend during this period of time. All the evidence produced at the hearing showed that S.H. and her boyfriend did not have sexual intercourse with each other until two months after the rape by the appellant. (emphasis added).
The appellant and her boyfriend were tested and both were found to be type A secretors. The semen found on the swimsuit came from a type A secretor.
If the defendant had evidence of a specific incident of sex between her boyfriend and S.H. during the weekend before the rape, it might have been admitted under Rule 412 to rebut the prosecutor's evidence that Homer Heflin was the source of the semen. The trial judge correctly noted in his order denying the Rule 412 motion:
Upon a hearing on said motion, witnesses were called by both the defendant and the State. The defendant failed to produce evidence at that hearing of any sexual intercourse between the victim and Greg Dukes during the time period immediately before the alleged rape. The defense motion is therefore denied. Sexual conduct, if any, of the victim after the alleged rape and prior to the alleged rape, other than that 48 hour period covered in the defense motions is not relevant to the issues in this case. The State's motion in limine is therefore sustained, excluding evidence of prior sexual behavior of the victim.
Appellant claims that the wording of this order permitted cross-examination of S.H. about the 48-hour period. Appellant is reading one sentence of this order and ignoring the one which preceded it. Reading all of the order together it says that having produced no proof of sexual activity during the period immediately before the rape (the 48-hour period), the defendant was precluded from questioning the witness on this issue, and, in addition, any other period of time would be irrelevant. Therefore he could not question the witness about any prior sexual behavior. The trial judge was correct in denying appellant's motion and in restricting the cross-examination of S.H. in accordance with that motion.
The prosecutor's questioning of S.H. on direct did not open the door to questions about her past sexual behavior, as appellant claims. Before starting his cross-examination, the defense attorney asked the court for a ruling of what effect this testimony had on the State's motion in limine to exclude the evidence of past sexual behavior. The judge said the defendant would be permitted to ask her about the statement that she made, but not question her on any specific prior sexual activity. Under the Rape Shield Statute and Rule 412 this was the correct ruling.
Appellant, in the case at bar, expanded the forty-eight hour period within which sperm may be detected per Debra Butler's testimony as mentioned at the Heflin I trial to seventy-two hours in this case. Appellant claimed that S.H. would testify that she and Greg Dukes had sexual intercourse on Saturday the 8th or Sunday the 9th of June, 1985. S.H. did not so testify but instead testified, as she had in the Heflin I case, that there had been no sexual intercourse with Greg Dukes prior to the rape incident with Homer Heflin. It is sheer speculation on the majority's part to attempt to go beyond the seventy-two hour range when intact, nonmobile sperm could be found. The majority's claim that even fourteen days is not impossible, is on the outer rim of what could be even remotely considered relevant evidence. Dr. Grissom testified that S.H.'s supposed comment recorded in his medical records was certainly not relevant to him regarding his findings and ultimate opinion.
Appellant Heflin and Greg Dukes were tested and both were determined to be type A secretors. It is undisputed that the semen Debra Butler testified that she found on S.H.'s swimsuit came from a type A secretor. Appellant sufficiently covered on direct examination as well as cross examination the significant factor that over eighty-five percent of the male population were type A secretors. The appellant's attorney at one *524 point even improperly told the jury that such statistics might prevent exclusion of himself, the trial judge, or members of the jury. The jury would have had to be blind not to recognize the significance of this statistic.
However, because the appellant had no evidence of any specific instances of sexual conduct between S.H. and Greg Dukes during this period of time, the trial judge was correct in disallowing examination of S.H. on the subject of prior sexual behavior under Rule 412. All of the evidence produced at the hearing prior to the second trial showed that S.H. and Greg Dukes did not have sexual intercourse with each other until two months after the rape by the appellant. Each of the previous learned trial judges have been correct to deny the defense attorney the opportunity to victimize this child by questioning her on embarrassing, but more importantly, totally irrelevant, issues at trial. The prejudicial affect of such testimony greatly outweighs any probative value. This case clearly illustrates the need for the current Rule 412 and the reason our legislature adopted the Rape Shield Statute in affect at the time of this incident.
Both the Appellant and the majority totally ignore the Heflin I trial court's reliance upon the Rape Shield Statute and Rule 412 as the basis for its opinion on this issue. Justice Prather's previous Heflin I majority opinion as well as this Court's current majority opinion should control on this issue, as nothing new has been added or addressed by the appellants.
Indeed, on Petition for Rehearing, the appellant fails to cite any case authority whatsoever. The single case of Goodson, a plurality decision cited by the majority was not furnished by the appellant, but rather by the majority and factually, it is not on point. This Court should not even consider this petition for rehearing. We have consistently held that where appellants decline to address an issue, fail to devote any discussion or attention thereto in their brief or fail to cite authority therefor, this Court will not address the issue. Smith v. Dorsey, 599 So.2d 529, 532 (Miss. 1992), See also, R.C. Petroleum, Inc. v. Hernandez, 555 So.2d 1017, 1023 (Miss. 1990); Brown v. State, 534 So.2d 1019, 1023 (Miss. 1988); Shive v. State, 507 So.2d 898 (Miss. 1987); Read v. Southern Pine Elec. Power Ass'n, 515 So.2d 916 (Miss. 1987); Devereaux v. Devereaux, 493 So.2d 1310 (Miss. 1986); Pate v. State, 419 So.2d 1324 (Miss. 1982).
It should now be abundantly clear, as reasoned by four distinguished and learned trial judges in two previous trials, and this Court in our previous Heflin I decision, together with this Court's current majority decision, that appellant has presented absolutely nothing to warrant reversal of this case.
I therefore dissent from the majority opinion on issue V in its entirety and would affirm.
HAWKINS, C.J., PRATHER, P.J., and JAMES L. ROBERTS, Jr., J., join this opinion.
NOTES
[1] The dissent suggests that testimony at the second trial was not significantly different from testimony in Heflin I where we affirmed the court on this issue. We disagree. Linda Heflin's testimony regarding Sherry's dates with Greg in the two or three days prior to the alleged incident, in addition to the fact that she wore the bathing suit in question on one of those dates and returned home with a hickey, adds significantly to the testimony and supports admission of the testimony into evidence. Additionally, the slightly different expert estimates given concerning the time limits for finding intact nonmotile sperm supports the admission of this evidence.