199 So.2d 58 (1967)
Dotson QUARLES
v.
STATE of Mississippi.
No. 44456.
Supreme Court of Mississippi.
May 22, 1967.
J.W. Kellum, Sumner, Joseph L. Tennyson, Charleston, for appellant.
Joe T. Patterson, Atty. Gen., by Guy N. Rogers, Asst. Atty. Gen, Jackson, for appellee.
SMITH, Justice:
Dotson Quarles was indicted for the murder of Olivia Collins. He was tried in the Circuit Court of Tallahatchie County, convicted of manslaughter, and sentenced to serve a term of twenty years in the penitentiary. *59 From that conviction and sentence this appeal has been prosecuted.
On January 31, 1966, Olivia Collins was found dead in a bedroom of her home. Bruises upon her body indicated that she had been subjected to a brutal beating. However, a pathologist, following an autopsy, stated that the fatal wound had been inflicted by a sharp instrument that penetrated the chest, the immediate cause of death having been loss of blood. Proof was introduced that freezing temperatures had prevailed in the locality for a number of days preceding the discovery of the body, which had frozen, and it was the opinion of the pathologist that death had occurred some twelve hours before the body became frozen.
On the day that the body was found, Quarles went to Chicago, although there is no evidence that he knew of its discovery.
A great deal of blood was splattered all about the bedroom where the body was found, the furniture in the room was in great disorder, and indications were that the victim had put up a violent struggle for life. There was also evidence that she had engaged in sexual intercourse shortly before death.
The first, and in fact only, contact between appellant Quarles and decedent, established by direct evidence, occurred on January 22, 1966. On that date, he had been asked by one Williams, a taxi driver, to accompany him to decedent's home to help "fill a gas bottle" for her. Williams had been telephoned by decedent who had asked him to come "fill her gas box," it appearing that she needed assistance in obtaining butane gas for her stove. As it turned out, when Williams and Quarles reached decedent's home, she told them she had been unable to get the money to purchase the gas. Williams and Quarles went inside the house when invided by decedent to come in. They stayed only a few minutes and left about 12:00 noon. During the course of the conversation relative to her inability to get money to buy gas, decedent stated that she expected to receive a welfare check four days later, on January 26. It was established that this check did arrive at the post office on that date, but never was picked up.
Williams testified for the prosecution and stated that he and Quarles went no farther into the house than the living room, and "that was the first room."
The principal circumstance in evidence, which the State argues connects Quarles with the crime, is that a hat, similar to a hat that Quarles was said to have worn, was found lying by the door in a hall to the house. A deputy sheriff testified, "* * * that hat was laying in a little hall, the little hall that ran from the door. There is one room to the right and one room to the left, and that hat was lying right in that hall by the door." It was not in the bedroom where the murder was committed, nor did it have any of the blood upon it with which nearly everything else in the bedroom was splattered. Nevertheless, in a statement taken from Quarles by the police in Chicago, he is quoted as having said that he had "lost a hat in Mississippi" of the same kind, color, and make, and with the same Chicago retailer's brand in it. An objection to the introduction of this statement, upon the ground that it was the result of duress and was not voluntary, was overruled after a hearing upon that issue. Several witnesses were placed on the stand by the State who said that the hat was similar, but none could identify it as that worn by Quarles. Quarles also disputed the accuracy of some of the things attributed to him in the statement.
Proof was introduced that the victim had blood type O, a common type, and that the same type was found to be on the inside (but not on the outside) of some trousers found in Quarles' possession in Chicago, and on his pocket knife, when he was arrested in Chicago on February 6, 1966. Quarles' blood was type B. Also, when arrested, it was discovered that one of *60 Quarles' fingers had two small cuts on the end of it and that he had a bruised eye. A Chicago policeman testified that Quarles first gave him a wrong name and that when he said to Quarles that he, Quarles, "had killed that woman down there" that Quarles had "hung his head" and had not replied.
Photographs appear in the record of the backs of Quarles' hands, purporting to show healed scratches, which, it is suggested, were made by decedent in the struggle with her assailant.
There was some further circumstantial evidence, but the above items constitute the principal circumstances upon which the State relies to support the conviction.
At the conclusion of the State's case, a motion to exclude the testimony and find Quarles not guilty was overruled. Quarles then put on witnesses to account for the cut finger, bruised eye, and trip to Chicago. This testimony was not rebutted by the State, and was not so intrinsically unreasonable as to be unbelievable. And while Quarles' explanation of how blood came to be on the inside of the trousers may be characterized as not wholly satisfactory, it is, possibly, at least, as reasonable as the State's theory that he committed this bloody murder while wearing them, but got no blood on the outside.
When both sides had rested and closed, a motion for a directed verdict of not guilty was overruled and a verdict of manslaughter was returned by the jury. A motion for a new trial was overruled.
It is noteworthy that the hat was never identified as Quarles' hat. It is true that Quarles is quoted in the statement taken in Chicago as having said that he had lost a hat in Mississippi, which he then described as matching the hat found, as to size and color, and even as to the name of a retailer stamped on the sweatband.
Quarles and two other witnesses testified that the hat found at the house was not his hat. No proof was offered that Quarles ever was in the vicinity of the decedent's house except when he was there with Williams on January 22. Questions as to whether he wore the hat on that occasion or had it on when he left were not explored.
The so-called healed "nail scratches" on the backs of Quarles' hands, as they appear in the photographs, are no more than one or two small scars of no particularly significant appearance. No scrapings were taken from beneath decedent's fingernails and it can be no more than an assumption that she had scratched her assailant's hands.
Quarles was a vocational student and introduced testimony, not rebutted, that the injury to his eye had resulted while working on an automobile in connection with his training The two small cuts on the end of a finger also were explained as having accidentally occurred in the course of his work at the school.
The fact that blood was found on the inside of the trousers, there having been none on the outside, fails to comport with the bloody nature of the crime, and, in fact, is more consistent with other explanations that suggest themselves.
Quarles' trip to Chicago on January 31 was characterized by the State as "flight", indicating guilty knowledge. The State's theory is that the decedent's failure to call at the post office for her welfare check on January 26 indicated that she was killed before that date. The body was not concealed, the doors to the house stood open, and it was only a fortuitous circumstance that it was not discovered until January 31. But Quarles remained in the community all of that time and did not go to Chicago until at least five days after January 26, and, when he left, it does not appear that he knew either of the discovery of the body or that he was wanted by the authorities, if, indeed, he had come under suspicion on that date.
*61 The trial court granted the following instruction at the request of the prosecution:
"The Court instructs the jury for the State of Mississippi that flight is a circumstance from which as a matter of law the inference of guilty knowledge and fear may be inferred and if you believe from the evidence in this case beyond a reasonable doubt that the defendant, Dotson Quarles, fled and remained in flight and hiding for a time after he killed Oliva Collins, if you do believe beyond a reasonable doubt that defendant did kill Oliva Collins, and if you further believe from the evidence in this case beyond a reasonable doubt that he did kill Oliva Collins with the intent to kill and murder Oliva Collins, you may take such flight or hiding into consideration along with all the other evidence in this case in determining the guilt or innocence of said defendant, Dotson Quarles."
This instruction should not have been given. It is confusing in form, capable of misleading the jury, and begins with an apparent assumption that Quarles "fled and remained in flight and hiding for a time after he killed Oliva Collins." Nor do we consider that the concluding portion of the instruction sufficiently removes this defect. It is "unexplained flight" from which, under certain circumstances, an inference of guilty knowledge may be drawn.
The language of this Court in Eubanks v. State, 227 Miss. 162, 85 So.2d 805 (1956), is pertinent here. In Eubanks, this Court said:
"* * * Instructions on flight, if given at all, should be used only in cases wherein that circumstance has considerable probative value. Moreover, such an instruction is primarily argumentative. 1 Alexander, Mississippi Jury Instructions (1953), Sec. 2341. However, even if the facts here had warranted an instruction on flight, this one is erroneous. It is practically a peremptory statement to the jury that appellant fled and that the jury could consider this with other facts in making an inference of guilt. It should have been qualified so as to be related to the facts of this case, and also to tell the jury it must first find the facts before it can use flight along with other circumstances to support an inference of guilt. 1 Alexander, Ibid., Sec. 2342." 227 Miss. at 168-169, 85 So.2d at 806.
The evidence implicating Quarles is weak. The case is close to the borderline as to its sufficiency to create a jury issue as to his guilt. However, we have carefully reviewed all of the evidence, and have concluded that in its totality it warranted the trial court in submitting the question to the jury for its determination.
We are constrained to hold that the language of this Court in Mister v. State, 190 So.2d 869 (Miss. 1966), applies with equal cogency here. In Mister, this Court said:
"The State's case was sufficient to survive defendant's request for a peremptory instruction, but under all the circumstances, the verdict is against the great weight of the evidence. The motion for a new trial should have been sustained. Since the evidence of defendant's guilt is of such nature as to create a serious doubt in our minds, we think that another jury should be permitted to pass upon this question. Cole v. State, 217 Miss. 779, 65 So.2d 262 (1953); Dickerson v. State, 54 So.2d 925 (Miss. 1951); Jefferson v. State, 52 So.2d 925 (Miss. 1951); Conway v. State, 177 Miss. 461, 171 So. 16 (1936)." 190 So.2d at 871.
Reversed and remanded.
ETHRIDGE, C.J., and PATTERSON, INZER, and ROBERTSON, JJ., concur.