736 So.2d 475 (1999)
Derrick Sentell EDWARDS, Appellant,
v.
STATE of Mississippi, Appellee.
No. 97-KA-01622 COA.
Court of Appeals of Mississippi.
April 6, 1999.
*477 Ross R. Barnett, Jr., Jackson, Attorney for Appellant.
Office of the Attorney General by Pat S. Flynn, Attorney for Appellee.
EN BANC.

MODIFIED OPINION

ON MOTION FOR REHEARING
SOUTHWICK, J., for the Court:
¶ 1. The prior opinion is withdrawn and this opinion is substituted. The motion for rehearing is denied.
¶ 2. Derrick Edwards was convicted by a Winston County Circuit Court jury of murder. On appeal he argues that there was insufficient evidence or at least that the verdict was against the great weight of evidence; hearsay was improperly admitted; an invalid jury instruction was given; and a continuance was erroneously denied. We agree that hearsay should have been excluded and that the verdict was against the overwhelming weight of the evidence. We reverse and remand.

FACTS
¶ 3. William Scott Tatum was shot and killed in front of Hattie Edwards's home in Louisville on May 7, 1997, around 2:40 p.m. Hattie Edwards is the grandmother of defendant Derrick Edwards. Trial testimony indicated that Tatum had been parked in Alice Circle when he was approached by Derrick Edwards. After standing by Tatum's truck for several minutes, Edwards walked away. Tatum then drove off and within approximately ten minutes was parked in the driveway of Hattie Edwards's house on Jefferson Street. Jefferson is one block away from Alice Circle and can be reached by walking through a yard on Alice to the backyard of the Edwards' home on Jefferson. Tatum was shot shortly after parking in the driveway. Two witnesses testified to seeing Derrick Edwards run away from the area of the shooting, though not contemporaneously with the shots.
¶ 4. The key witness, Larry Warren, was seated in the passenger's seat of a jeep driven by Gary Porter which was proceeding northwards on Warner Avenue either crossing or about to cross Jefferson Street when Porter and Warren heard shots. Warren testified that he heard three shots and then turned to see someone shoot two more times at Tatum from close range. The Edwards' home where Tatum was shot was the second house from the Jefferson-Warner intersection. The certainty of Warren's identification of the shooter is central to several appellate issues.
¶ 5. Warren and Porter, along with a third person who did not testify, then turned around and went to the crime scene. Warren ran to his mother's house making statements implicating Derrick Edwards. Hattie Warren and Lakeesha Thames testified to hearing these statements though they differed on the contents. Thames and Michelle Woods testified to seeing Derrick Edwards run along a fence near the crime scene after the shooting. Thames saw Edwards after having seen the witness Larry Warren running. Woods saw Edwards ten to fifteen minutes after the shooting. Edwards was arrested later the same day.
¶ 6. In Larry Warren's statement to the police on the day of the shooting, he did not identify anyone as the shooter. The following day Warren gave a second statement *478 saying that he thought Edwards was the person whom he saw. Warren testified this second statement was made after he was arrested by the police and told he could be charged with withholding evidence. Warren also said there was another person, besides the victim and defendant, present at the shooting though this individual was never identified. Larry Warren testified he thought it was Derrick Edwards he saw shoot the victim but admitted he was some 50 yards away from the scene and his view was obstructed by the victim's truck.

DISCUSSION
Issues 1 & 2: Evidence to support the verdict.
¶ 7. The question of admissibility of hearsay evidence is discussed in tandem with the weight and sufficiency issues as all are intertwined.
¶ 8. Two important sets of statements were made. One set was from witnesses who saw Edwards running after the shooting. The other set was from witnesses who overheard Larry Warren identify the shooter. Regarding the first set of statements, Officer Donnie Graham was allowed to testify by relating what he was told by witnesses during his investigation.
Q. Mr. Graham, did you have an occasion to talk to Michelle Woods and Lakeesha Thames?
A. Yes, we did.
Q. Did they tell you whether or not they heard the shots fired over close to the Edwards' residence?
A. I believe Miss Thames said she did not hear the shots but Miss Woods did.
Q. Shortly after the shots were fired did she identify any individual leaving from close proximity of the Edwards' residence?
A. Yes, she did.
Q. Who did she identify?
BY MR. AUSTIN: I am going to object to that. That is not the best evidence. She can testify as to whether or not she identified somebody.
BY MR. HORAN: Your Honor, this is identification after she perceived that individual, shortly after.
BY THE COURT: It's overruled.
Q. Did she identify anybody leaving from the Edwards' residence.
A. Both identified Derrick Edwards as running away from the residence.
¶ 9. Edwards argues that this was neither a permissible present sense impression nor excited utterance exception. The trial court did not specify the rule under which the admission was allowed. At trial, the State argued that this was "after she perceived that individual, shortly after." That appears to be a present sense impression argument.
¶ 10. The relevant evidentiary rule describes the present sense hearsay exception as permitting a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." M.R.E. 803(1). This exception did not exist in Mississippi until the adoption of the Rules of Evidence in 1986. M.R.E. 803(1) cmt. The drafters of the rule emphasized that spontaneity is the critical element. Id. The supreme court has held that the "determination of spontaneity `is a question for the trial judge, whose action should not be overturned unless this Court would be justified in concluding that under all and any reasonable interpretation of the facts the exclamation could not have been spontaneous.'" Clark v. State, 693 So.2d 927, 932 (Miss.1997) (quoting Evans v. State, 547 So.2d 38, 41 (Miss.1989)).
¶ 11. The present sense impression rule requires a spontaneous statement, not one in response to a question. Had someone been told by or overheard one of these witnesses state at the time or soon after the event that she had seen Edwards running, then that is potentially admissible under this exception. For a witness to give a response to an officer's question is *479 by definition not "spontaneous," no matter how soon it is made after the event that is the focus of the questioning. "Spontaneous" means "happening or arising without apparent external cause; self-generated." AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3d ed.1992) at 1741. Answering an officer's question is not a "self-generated" statement, but a police-generated one. These therefore were not present sense impressions.
¶ 12. Even though the trial court did not appear to rely on the excited utterance exception, we evaluate that hearsay rule as an independent ground for admission. Officer Graham did not identify Woods or Thames as being present at the scene when he arrived. The State argues that Graham "arrived at the scene within two or three minutes of the shooting." Actually, our reading of the transcript reveals that Graham was the third police officer on the scene and arrived within two or three minutes of getting the emergency call, not within two or three minutes of the shooting. Therefore it is unstated how long after the shooting these statements were made. When Graham talked to these witnesses was still further after the event.
¶ 13. The excited utterance exception applies to a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." M.R.E. 803(2). The "reliability of an excited utterance is based on the premise that circumstances may place the declarant in such an excited state as to temporarily impede the capacity for reflection." Owens v. State, 716 So.2d 534, 535-36 (Miss. 1998) (quoting Clark v. State, 693 So.2d 927, 932 (Miss.1997)). Owens reviewed the principal supreme court opinions that applied this exception.
This Court found in Clark [v. State, 693 So.2d 927, 932 (Miss.1997) ] that a woman's hysterical 911 call to the police while her estranged boyfriend was outside the door threatening to kill her with a shotgun qualified as an excited utterance under 803(2) and was properly admitted. The Court has approved other instances of hearsay statements rendered admissible by this exception. See Heflin v. State, 643 So.2d 512 (Miss.1994)(sixteen year old alleged rape victim made statement to sister twentyfour hours after assault); Davis v. State, 611 So.2d 906 (Miss.1992)(eight year old child made statement to her aunt immediately after witnessing sexual assault of her mother); Berry v. State, 611 So.2d 924 (Miss.1992)(victim of shotgun blast identified assailant shortly after shooting and before death); Baine v. State, 606 So.2d 1076 (Miss.1992)(seven year old victim of sexual abuse made statement within minutes, and later hours, to her mother concerning abuse); Sanders v. State, 586 So.2d 792 (Miss.1991)(fourteen year old sexual battery victim made statement to police a short time after assault).
Owens, 716 So.2d at 536. Owens itself involved a statement made to police an hour after the declarant had been forced to jump out of a moving car. The court found that his statements were reflective and not under the influence of the exciting event. Id.
¶ 14. The trial court never found that these statements were excited utterances. Though a witness to the shooting itself certainly saw a startling event, these witnesses merely saw Edwards running. The officer never testified as to the witnesses' apparent state of mind, their being flustered or excited or otherwise under the stress of the event. On this record, we cannot conclude that these were properly admitted under this exception. There simply was no evidence that they were made while under the effect of an exciting event.
¶ 15. The State maintains that even if improperly admitted, such was harmless error since Thames testified to essentially the same thing that Officer Graham said that she had said. We find some significant differences between the statements, *480 however. Graham's testimony implied that Woods and Thames saw Edwards shortly after the shooting. In fact, Woods was unsure how long after the shooting she saw Edwards but indicated it may have been ten or fifteen minutes. Thames's testimony was that she saw the witness Larry Warren running before she saw Derrick Edwards running. Warren was still in a vehicle driving by when the shooting occurred, had to turn around and go to the driveway where the body lay, and then ran the direction that caused him to be noticed by Thames.
¶ 16. Thus neither eyewitness indicated that she had seen Edwards running immediately after the shooting. There was testimony that soon after the shooting quite a few people gathered. Edwards lived in the immediate vicinity. That he was seen running ten minutes after the shooting or even three minutes at a time when other people were gathering or scattering is not probative of guilt.
¶ 17. Other hearsay evidence of Edwards's guilt was also introduced, namely, that Larry Warren told people that he saw Edwards shoot Tatum. The key distinction between what Warren said at trial and what other people perhaps overheard him say soon after the shooting is the level of certainty that Warren expressed that it was Edwards who did the shooting.
¶ 18. Lakeesha Thames testified to having heard Larry Warren say "momma, momma, Derrick done shot that boy." She repeated essentially the same statement two more times while on direct examination and on cross-examination agreed that this was what she had heard. Thames was not asked whether Larry Warren had qualified his statement in any way. Edwards's objection to the testimony was overruled as the court found that the excited utterance and present sense impression exceptions both applied.
¶ 19. The next witness was Hattie Warren. Mrs. Warren testified that she heard her son Larry say a few minutes after the event, "I think Little Derrick had killed.... I think Little Derrick done killed the white man out there." Thus Larry Warren's mother heard him say that he thought it was Derrick Edwards. On cross-examination she specifically said that her son "didn't say he saw him. He said he thought Derrick had shot the white man." On redirect the prosecutor asked, "Just so I understand you correctly. What you testified a minute ago and what Larry said to you was that Derrick had shot that white man; is that right?" To which Mrs. Warren responded "That's what he told me." Though the State would have us read the short affirmative answer to the prosecutor's question as removing the qualifying word "thought" from her other testimony, we find the only fair reading to be that Larry Warren's mother heard her son say that he thought Edwards was the shooter. This testimony was admitted as a present sense impression.
¶ 20. We find no error in admitting this hearsay. Larry Warren made the statement within minutes of the shooting. He was running to tell his mother what had occurred. Lakeesha Thames testified that he was speaking loudly though she could not say whether or not he was excited. Since his comments were soon after he saw a murder, and he seemed to be yelling to those who were within earshot as to what he had seen, we affirm the trial court that these at least were Warren's spontaneous present sense impressions. Whether his state of mind also was adequate for an excited utterance is not strongly evidenced, but is also irrelevant. One hearsay exception is enough.
¶ 21. With these hearsay statements introduced identifying Edwards as the shooter, we then must evaluate whether there was sufficient clarity to the identification evidence to support the jury's verdict. At best, all but one prosecution witness only put Edwards near the scene near the time of the crime. Some confirmed that he was wearing dark clothing *481 as Larry Warren claims the shooter was wearing. Larry Warren is the only person to put Edwards at the scene, at the time of the crime, pulling the trigger. At trial Warren vacillated as to his identification:
Q. Okay. Mr. Warren, when you saw that individual shoot that man dead, did it appear to you that you knew who it was?
A. Yes.
Q. Who did it appear to you that it was?
A. At the time I thought it was Little Derrick.
Q. Derrick Edwards. And when you got through looking at that man did you go to your mother's house?
A. Yes.
Q. And did you tell her that you saw Little Derrick shoot the man?
A. Yes.
¶ 22. Probably Warren's strongest statement regarding identification of Derrick Edwards came on redirect examination.
Q. Walked out this way. So the shooter went this way behind the Edwards' residence, and the other guy walked away. And you testified on direct examination that the guy that killed Mr. Tatum, the guy that you later identified as Derrick Edwards, had on dark clothes. (indicated)
A. Right.
Q. So you did give a description as to what he had on. He had on dark clothes, dark shirt and dark pants.
A. Right.
Q. That's the guy that shot William Scott Tatum, the white fellow in the photographs.
A. (nodded).
BY THE COURT: You have to answer out loud.
A. Yes.
¶ 23. Warren testified he saw three people at the scene, the victim and two others. He could not identify their clothing though on direct and redirect examination he confirmed the shooter was wearing dark clothes. Warren said the shooter ran towards the rear of the Edwards' house while the other person went towards Warner Avenue. On cross-examination Edwards testified rather directly that he did not know whom he had seen.
Q. And you have no idea who these two people were.
A. No.
Q. You then went to your mother's house.
A. Yes.
Q. And you told your mother there had been a shooting.
A. Yes.
Q. What exactly did you tell her? Did you tell her that you thought Little Derrick had shot somebody, or did you tell her you saw Little Derrick shoot somebody?
A. I told her I thought Little Derrick shot someone.
Q. You weren't sure at that time.
A. No.
* * *
Q. And even here today you are not sure of who those people are or were?
A. No, I am not.
¶ 24. On redirect Warren said it was his belief Derrick Edwards had done the shooting.
Q. You testified on direct examination that the person you saw firingyou saw firing that gun five times appeared to be Derrick Edwards. Is that what you are testifying to here today?
A. That is what I believe. That is who I believe it was.
¶ 25. On rehearing, the State refers to this testimony and asserts with unveiled suspicion that "for some reason, this statement was the only part of Edward's identification testimony [presumably meaning all testimony that identified Edwards] which *482 was not quoted in the opinion." In fact, what we just quoted was in the original opinion and was apparently overlooked by the preparer of the rehearing motion. In fairness, it was a long opinion. Yet on such a review the State admonishes the Court to "consider all the evidence, not that carefully culled from the record for the written opinion...." If we were thought to have included all but one carefully culled item of relevant identification testimony, and it is now obvious that this item was also considered, then the opinion succeeded at least at the level of revealing the available evidence.
¶ 26. Thus the only unqualified identification ever presented to the jury was the hearsay statement through Lakeesha Thames that Warren had stated "Derrick done shot that boy." One reaction to such evidence might be that what the eyewitness himself (Warren) says at trial is controlling. However, that is too limited. Witnesses' memory, candor, and even their courage can be affected by the passage of time and the circumstances of the statements. In his initial interview by the police Warren did not even mention Edwards. At trial Warren testified that when asked by the police if he recognized either of these people he said he did not. The next day he gave a second statement implicating Edwards but even then Warren admitted that he was uncertain that it was Edwards. The jury is entitled to give some credence to what a witness says spontaneously during the crime.
¶ 27. We evaluate first whether this conviction can be sustained if the only identification from Warren was that he believed but was unsure that Edwards was the shooter, i.e., what is the effect if we exclude the hearsay statement from Thames? The State argues that this is an issue of credibility for the jury. In fact, it is no such thing. It is an issue of certainty. Taking Warren as completely credible, we are still left with his uncertainty. The State on rehearing argues that this Court has overridden the principle that the jury is entitled to accept or reject testimony, and citing Tyler v. State, 478 So.2d 315, 317 (Miss.1985). Interestingly, in Tyler the court stated this principle but then reversed and rendered on a judgment of conviction. Id. The problem that we are addressing is a positive identification. If one witness expresses certainty in identification and is then impeached or contrary evidence is introduced, that conflict is a matter for the jury to resolve. Here, other than the Thames testimony, there is no evidence that Warren ever positively identified Edwards.
¶ 28. The absence of a positive identification cannot be replaced by citations to cases dealing with the broad discretion of a jury. The supreme court has said this regarding the issue:
The character and adequacy of evidence of identification of an accused in a criminal case is primarily a question for the jury, provided the evidence could reasonably be held sufficient to comply with the requirement of proof beyond a reasonable doubt. The jury need not be controlled by the number of witnesses testifying to the identification of an accused. Identification based on the testimony of a single witness, if complying with the standard in criminal cases, can support a conviction, even though denied by the accused. The jury can appraise the truthfulness of an asserted alibi. In short, positive identification by one witness of the defendant as the perpetrator of the crime may be sufficient, as in the instant case.
Passons v. State, 239 Miss. 629, 634, 124 So.2d 847, 848 (1960), quoted in Mamon v. State, 724 So.2d 878 (Miss.1998). In Passons the court held that "positive identification by one witness of the defendant as the perpetrator of the crime may be sufficient," and we would read that to mean that such evidence is also necessary unless other proof adequately points to a defendant's guilt. If the State is arguing that Warren was really more certain than he would admit and that his uncertainty was *483 impeached, the impeachment does not become evidence. It only undermines Warren's credibility. Absent Thames's hearsay testimony, there is no evidence that becomes credible if Warren's uncertainty becomes incredible. Even if the State made the jury believe Warren was not being candid, that doubt about Warren cannot be transformed into a positive identification. Only evidence can do that.
¶ 29. For evidence that is sufficient to convict, the jury must among other requirements be given proof that identifies the accused in a manner adequate to convince them beyond a reasonable doubt. If only one person makes the identification and there is no other evidence that adds to it, then if that witness himself is not convinced beyond a reasonable doubt, neither may be the jury. Here, Warren's statement that he "believed" or "thought" Edwards committed the crime but was not certain is simply inadequate by itself to permit a conviction. True, a positive identification of a suspect is not required if other evidence is sufficient to support the jury's verdict. Bogard v. State, 233 So.2d 102, 105 (Miss.1970). However, the only other evidence is that Edwards was in the vicinity of the crime both before and after the shooting. So were other people. He also had on clothes similar to that worn by the person whom Warren saw shoot the victim. The clothes were merely described as "dark" and there was nothing distinctive about them. Edwards talked with the victim some ten minutes before the shooting and was seen running from the area where the crime occurred within a few minutes after the shooting, though perhaps as long as ten or fifteen minutes after.
¶ 30. Appellate review of the sufficiency of evidence requires that we take all the evidence in the light most favorable to the State, including permitting all reasonable inferences from the evidence. Holloman v. State, 656 So.2d 1134, 1142 (Miss.1995). If the evidence to prove one of the elements of the chargethe identity of the accused is always an elementis such that reasonable jurors could only find the accused not guilty, then we must reverse. Id. The evidence here is Warren's qualified identification, hearsay statements that immediately after the crime he only "thought" Edwards was the shooter, Edwards's presence in the neighborhood where he lived talking to the victim some ten minutes before the shooting, and Edwards's running from the crime scene either ten minutes after the shots were fired or at least after the eyewitness was also seen running. The shots had caused other people to begin gathering by that time. None of the evidence besides the identification would permit a juror to conclude that Edwards was involved in the crime as opposed to just being in the vicinity. And the identification is too qualified to permit conviction.
¶ 31. Thus we are left with assaying the worth of Lakeesha Thames's testimony. She alone testified that the eyewitness Warren made a positive identification. Every other witness said otherwise. Could a reasonable juror use Thames's statement to find that a reliable identification of the murderer had been made? Thames was never asked to focus on whether Warren's words indicated certainty or only a belief. She was the first person to testify on the point, and the careful cross-examination of Warren's mother on that question occurred next. The jurors could make a reasonable though not inevitable inference from this evidence that Warren was sure at the time, that Thames did in fact overhear his certainty, and for some reason Warren and his mother testified differently at trial. This is tenuous, but it does meet sufficiency concerns since it is a factual question over "which reasonable jurors could disagree." Vines v. Windham, 606 So.2d 128, 131 (Miss.1992). Thus, there was sufficient evidence to put the issue of identification before the jury.
¶ 32. Evidentiary weight is another matter. "A new trial is to be granted if *484 the jury's verdict so contradicts `the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice.'" Pierre v. State, 607 So.2d 43, 54 (Miss.1992), quoting Groseclose v. State, 440 So.2d 297, 300 (Miss.1983). The prosecution never produced a weapon, a motive, nor any physical evidence linking the defendant with the crime. None of the people who saw Edwards running saw him with a gun. Uncorroborated by any other substantial evidence regarding a positive identification, the Thames testimony about what she heard Warren say is simply too slender a reed on which to support a conviction. In one circumstantial evidence case, the court held that the "evidence implicating [the defendant] is weak. The case is close to the borderline as to its sufficiency to create a jury issue as to guilt." Quarles v. State, 199 So.2d 58, 61 (Miss.1967). The court held that the evidence was sufficient to avoid a directed verdict but created such doubt in the court's mind that another trial must be ordered. Id. The overwhelming weight or decided preponderance of evidence does not show Edwards's innocence. There is however an overwhelming gap in meaningful proof of the shooter's identity. There may be sufficient evidence to prove that element of the offense, but one person's recollection of what an eyewitness said at the time, a statement no one else heard in that way, is of only slight weight.
¶ 33. Within a broad range, weighing evidence is solely the jury's function. Miller v. State, 634 So.2d 127, 130 (Miss. 1994). We are nonetheless here left with the firm belief that to allow this conviction to stand based on this evidence is an unconscionable injustice.
¶ 34. Our reversal on the basis of the weight of the evidence necessarily means that Edwards can be retried. Tibbs v. Florida, 457 U.S. 31, 46, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). If the exact evidence and no more is admitted again, the fact that a different jury looking at the same proof reaches the same conclusion means that a second reversal would not necessarily be appropriate in the interests of justice. Id. at 43 n. 18, 102 S.Ct. 2211.
¶ 35. On rehearing the State expresses amazement that we distinguish between an issue of sufficiency of the evidence, requiring a judgment of acquittal, and one of weight for which a new trial is permitted. The description of the holding of Tibbs is called "specious in the extreme." Tibbs was not unanimous, and perhaps the State's exasperation would resonate with the Tibbs dissenters that thought a new trial would be barred by double jeopardy. However, we have accepted the view of the Supreme Court majority. We note other evidence of the State's rehearing indignation:
This Court, in effect, is saying: "Yes, the trial court was right in sending the case to the jury for deliberation, but that deliberation is of no effect since the jury had only one choice: to find the defendant not guilty. Since the jury did not make that choice, we are sending the case back for another jury's determination. What is the difference between this and a directed verdict?"
The writing judge on behalf of the Court has obviously failed to explain the distinction between review of the sufficiency and a review of the weight of the evidence. That these are two separate questions is apparent from innumerable decisions of both the supreme court and of this Court. Since they are separate issues with separate standards, it is hardly surprising that the result of finding error as to one leads to a different appellate result than error as to the other.
¶ 36. Exactly 150 years ago, we find this state's highest court holding that it would order a new trial in a criminal case if the verdict of guilt was "opposed by a decided preponderance of the evidence, or is based on no evidence whatever." Cicely v. State, 21 Miss. 202, 13 Smedes & M. 202, 212-213 *485 (1849), quoted in Tolbert v. State, 407 So.2d 815, 820 (Miss.1981).
¶ 37. That somewhat dated formulation (today it would be said that if there is no evidence, a reversal and discharge of the defendant is required) has been succeeded in subsequent years with other explanations. For at least 70 years the appellate rule has been to examine the evidence supporting a conviction in the light most favorable to the State. Redwine v. State, 149 Miss. 741, 115 So. 889 (1928). That review standard was also described as a requirement to accept the State's evidence as true when the record reveals a conflict in evidence. Creel v. State, 186 Miss. 738, 191 So. 814, 816 (1939). However, this has never meant that the appellate court has no role in the review of evidentiary sufficiency and weight:
But "while it is the thoroughly wellestablished general rule that the judgeand this includes the Supreme Courtis not to interfere with the findings of the jury on questions of fact, there is the equally well-established and imperatively essential exception to that rule that, although the court is reluctant to do so, the verdict is reviewable when manifestly it is without the substantial support of any competent evidence, or is clearly contrary to the overwhelming weight of the evidence," Brown v. State, 153 Miss. 737, 121 So. 297 (1929), to which is to be applied, as a corollary of the above statement of the rule, that the support of the verdict must be of believeable proof, Lefere v. Krohn, 127 Miss. 305, 90 So. 12, taking all the evidence of the case into consideration, or, as otherwise stated, the evidence must be such that upon some justifiable view of it the verdict is supported by itthe verdict must be supported by evidence which has such sufficiency in substance and cogency that an impartial and intelligent mind, could reasonably act upon it in support of the conclusion reached, 2 Thomp. on Trials, p. 1507.
Byrd v. State, 154 Miss. 742, 750-51, 123 So. 867, 869 (1929). In Byrd, the court found that the only credible evidence supported the defendant's innocence. The conviction was reversed and, "since it is clear, from the entire situation, that the case is such that we would be compelled to take the same action in the event of another conviction, we order the defendant discharged." Id. at 754, 123 So. at 871.
¶ 38. Conversely, it is no recent innovation to order a new trial when the appellate court finds evidence to exist, but it is of such a nature as to raise doubts as to the verdict:
Ordinarily this court does not disturb the finding of fact by a jury, nor review such finding except to determine whether or not there is sufficient evidence, if believed by the jury, to support the verdict.... However, an exception to this rule may arise in exceedingly rare cases where, from the whole circumstances, the testimony is contradictory and unreasonable, and so highly improbable that the truth of it becomes so extremely doubtful that it is repulsive to the reasoning of the ordinary mind. In such a case we think it proper to award a new trial on the facts, and let another jury have an opportunity to weigh and judge the testimony at another time, and under different circumstances....
Thomas v. State, 129 Miss. 332, 92 So. 225, 226 (1922).
¶ 39. In Thomas, the court reversed and remanded for a new trial. A new trial is the venue at which "the mistake of the first jury may be corrected, if a mistake has been made, and justice in the case, which the state desires as well as the accused, can be duly awarded." Id. Perhaps no mistake was made. That is the reason the United State Supreme Court in this very kind of situationa reversal due to weight of evidenceheld that the same verdict based on the same evidence at a second trial might not lead to appellate reversal. Tibbs v. Florida, 457 U.S. at 43 n. 18, 102 S.Ct. 2211.
*486 ¶ 40. The reason for reversal is this: the only eyewitness to the crime never testified that he was certain that Edwards was the culprit; the only augmenting evidence was from one person who said that she overheard that eyewitness say that Edwards committed the crime. To reverse a conviction and order a new trial because of significant weakness but not total want of evidence is the course marked by a century of Mississippi jurisprudence. We must follow that path as well.
Issue 3: The jury was not instructed on elements of the crime charged.
¶ 41. The state correctly points out that the defendant did not object to a now-complained about jury instruction during the trial. The issue is therefore barred. The complaint is that the trial court failed to instruct the jury that an accused must have a "deliberate design" to cause death. However, "malice aforethought, premeditated design, and deliberate design all mean the same thing." Johnson v. State, 475 So.2d 1136, 1139 (Miss.1985). This instruction used the term "malice aforethought." That was sufficient.
Issue 4: The trial court abused its discretion in failing to grant the continuance requested by Derrick Edwards.
¶ 42. Granting or denying a continuance is a matter left to the sound discretion of the trial court. Lambert v. State, 654 So.2d 17, 22 (Miss.1995). The prosecution gathered blood, hair, and clothing samples from Edwards and submitted them to the state crime lab. However, since no foreign matter was found on the victim with which to compare the samples with, no comparisons were made. Test results on the aforementioned samples were not requested by the defense until the morning of the trial. Since there was nothing to compare them to, it is difficult to see how the defense was prejudiced by not having the tests performed and it is prejudice to the defendant which is the dispositive inquiry on this issue. See Jackson v. State, 538 So.2d 1186, 1189 (Miss.1989). The defense was free to bring out the fact that no physical evidence connected Derrick Edwards with the crime. Testimony regarding the negative results of a gun powder residue test performed on the defendant was brought out by the defense through the testimony of David Whitehead.
¶ 43. We find no error in the trial judge's refusal to grant a continuance.
¶ 44. THE JUDGMENT OF THE CIRCUIT COURT OF WINSTON COUNTY IS REVERSED AND THE CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS OF THIS APPEAL ARE ASSESSED TO WINSTON COUNTY.
McMILLIN, C.J., KING, P.J., COLEMAN, DIAZ, PAYNE, AND THOMAS, JJ., CONCUR.
IRVING AND LEE, JJ., NOT PARTICIPATING.
BRIDGES, J., DISSENTS WITHOUT WRITTEN OPINION.