881 So.2d 234 (2003)
Curtis David HAWTHORNE, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2002-KA-01142-COA.
Court of Appeals of Mississippi.
October 21, 2003.
Rehearing Denied February 10, 2004.
*235 Robert W. Davis, Christi R. McCoy, attorneys for appellant.
*236 Office of the Attorney General by Billy L. Gore, attorney for appellee.
Before KING, P.J., BRIDGES, J., and LEE, J.
LEE, J., for the Court.

PROCEDURAL HISTORY
¶ 1. On May 16, 2002, a jury in the Circuit Court of Lee County found Curtis David Hawthorne guilty of manslaughter by culpable negligence. Hawthorne was subsequently sentenced to serve fifteen years in the custody of the Mississippi Department of Corrections with seven years suspended, and he was ordered to make restitution in the amount of $325,000. From his conviction, Hawthorne appeals to this Court asserting the following issues: (1) the evidence at trial was insufficient as a matter of law to support the jury's verdict; and (2) the court erred in refusing to grant a mistrial after one of the jurors became ill.

FACTS
¶ 2. In November of 2000, Hawthorne, who is a resident of Virginia, was in Tupelo helping his father refurbish a hotel. During the days immediately preceding the accident, Hawthorne and his father began discussing religion for hours on end. Following these religious discussions, Hawthorne began to have feelings and sensations that he and his father interpreted as religious experiences. In reality, Hawthorne was experiencing symptoms of schizophrenia. Hawthorne began to hear what he believed to be the voice of God or the Devil. He also began to believe that he was in Hell, that the day of judgment was at hand, that the television was sending messages to him from God or the Devil, that he was going back in time, and that the presidential election of 2000 was being held specifically for him. Hawthorne was observed walking around in a trance and praying in the rain. After experiencing these feelings, Hawthorne believed that he had to go home to Virginia in order to deliver a cross to his daughter, cure his wife's cancer, and be home before the world came to an end.
¶ 3. On the morning of November 15, 2000, Hawthorne, still under the impression that he had to get to Virginia, borrowed his father's truck and proceeded down South Gloster Street at a high rate of speed. In his state, Hawthorne believed that he was in God's truck, that no matter what direction he drove he would reach Virginia, and that his truck would pass through any obstacles he might encounter. At the intersection of Green Street and Gloster Street, Hawthorne proceeded through the red light and struck the car driven by Jeffrey McGrew, who died at the scene.
¶ 4. After the accident, Hawthorne proceeded to exit his truck and run south on Gloster Street. Hawthorne was quickly apprehended and taken to the sheriff's department. After attempts at interrogation, during which Hawthorne exhibited erratic behavior, Hawthorne was transported to North Mississippi Medical Center where he was examined by the emergency room physicians and a psychiatrist.

DISCUSSION OF ISSUES

I. WAS THE EVIDENCE AT TRIAL INSUFFICIENT AS A MATTER OF LAW TO SUPPORT THE JURY'S VERDICT?
¶ 5. In his first issue, Hawthorne claims that no reasonable and fair-minded juror could have found him guilty based on the evidence presented by the State. Hawthorne contends that the State did not meet its burden of proof in establishing sanity beyond a reasonable doubt and, *237 therefore, the judge should have granted Hawthorne's motion for a directed verdict. After the jury returned a guilty verdict, Hawthorne filed a motion for a judgment notwithstanding the verdict, which was also denied.
¶ 6. We look to our standard of review regarding motions for a directed verdict or a JNOV.
In deciding whether the prosecution has presented sufficient evidence to sustain the verdict, the Court should accept as true all credible evidence consistent with the defendant's guilt and the State must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence. A reviewing court should only reverse where, with respect to one or more of the elements of the offense charged, the evidence is such that reasonable and fair-minded jurors could only find the accused not guilty.
George v. State, 812 So.2d 1103(¶ 13) (Miss.Ct.App.2001) (citation omitted). If the trial court denies the motions and that denial is raised as an issue on appeal, this Court is charged to review the evidence by the same standard to determine whether the trial court erred in so ruling. McClain v. State, 625 So.2d 774, 781 (Miss.1993).
¶ 7. Mississippi still follows the M'Naghten test for determining a person's sanity at the time of the crime. Russell v. State, 729 So.2d 781, 784 (Miss.1997). Under the M'Naghten test, it must be proved that at the time of committing the act the accused "was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing was wrong." Roundtree v. State, 568 So.2d 1173, 1181 (Miss.1990). More succinctly, the test is whether the accused did not know right from wrong at the time of committing the act. Russell, 729 So.2d at 784.
¶ 8. There is a presumption that an accused is sane and, therefore, the burden is initially on the accused to introduce evidence creating a reasonable doubt as to his sanity at the time of the act. Once the accused has overcome this initial burden, it then becomes the burden of the State to present sufficient evidence to prove the accused's sanity beyond a reasonable doubt. Davis v. State, 551 So.2d 165, 173 (Miss.1989). The issue of insanity is for the jury to determine. Yarbrough v. State, 528 So.2d 1130, 1130 (Miss.1988). The jury may accept or reject expert and lay testimony in making its determination. Gill v. State, 488 So.2d 801, 802 (Miss.1986). However, if the jury's determination is not supported by substantial evidence, then this Court will reverse. Gerlach v. State, 466 So.2d 75, 79 (Miss.1985).
¶ 9. According to the record, we find that a reasonable doubt was created as to Hawthorne's sanity at the time of the accident. Hawthorne's father testified about their religious conversations in the days preceding the accident. Although his father testified that he thought Hawthorne knew right from wrong at the time he accepted the Lord, he could not be sure if his son retained this thought. The defense called three physicians who were experts in psychiatry and who had seen Hawthorne at some point after the accident. Dr. Mark Webb, who specializes in general and forensic psychiatry, interviewed Hawthorne a few weeks after the accident. After the interview and the review of Hawthorne's records, Dr. Webb determined that Hawthorne had suffered a brief psychotic episode, generally called a "first break," and that Hawthorne was manic depressive or bipolar. Dr. Webb also determined that Hawthorne did not know right from wrong at the time of the accident *238 nor did he have the capacity to understand the nature and quality of his actions.
¶ 10. Dr. Harrison Evans, a psychiatrist, saw Hawthorne on the day of the accident in the emergency room. Dr. Evans was called by the emergency room physician to evaluate Hawthorne for possible admission to the behavioral health unit. During the examination, Dr. Evans determined that Hawthorne was experiencing a severe psychotic break. Hawthorne kept repeating that he was in Hell, that he was dead. Dr. Evans felt that he was having hallucinations and, after repeated attempts at getting information from Hawthorne, who was mumbling unintelligibly, the interview ended and Dr. Evans continued with behavioral observations. Dr. Evans also spoke with Hawthorne's father and the policemen present at the hospital. Hawthorne was diagnosed by Dr. Evans as having a schizophreniform disorder. Dr. Evans also found Hawthorne to be close to catatonic and severely impaired by hallucinations. Over the next few weeks, Dr. Evans was able to see Hawthorne two more times. During his testimony, Dr. Evans opined that Hawthorne's condition had improved significantly, although he thought Hawthorne still had some residual voices at that time.
¶ 11. Dr. Reb McMichael, the chief of forensic services at Whitfield State Hospital and acknowledged by the State to be an experienced forensic psychiatrist, interviewed Hawthorne pursuant to an order from the lower court on a motion made by the State. After reading various documents associated with the accident, including hospital reports and medical records, and after approximately four hours of interview and psychological testing of Hawthorne, Dr. McMichael determined that Hawthorne did not know the nature and quality of his act and that he did not know the wrongfulness of his act. Dr. McMichael further determined that Hawthorne was restored to reason and not a threat to society.
¶ 12. Hawthorne's current psychiatrist in Virginia, Dr. William Lopez, testified that he felt Hawthorne had suffered a first psychotic episode. Dr. Lopez testified that Hawthorne's condition had improved over the course of treatment, that he was having no psychotic symptoms or behavior indicating any sign of violence, and that he did not need to be hospitalized.
¶ 13. Once Hawthorne rested it became incumbent upon the State to present sufficient evidence to rebut any testimony by Hawthorne creating a reasonable doubt as to his sanity at the time of the accident. After both sides rested, the defense renewed its earlier motion for a directed verdict, which was ultimately denied. However, during the presentation of this motion, the trial judge asked the State the following question:
[C]an you point the Court to any item of evidence produced by the State at any stage in the trial by any witness or, for that matter, any exhibit which tells the jury that Mr. Hawthorne knew the difference between right and wrong and appreciated the nature and quality of his acts at the time of this wreck on November 15, 2000?
The State's only response to this inquiry was "No, your honor." The State's position was that it did not have to produce any evidence of the defendant's sanity; rather, it was for the jury to determine. We find that there was sufficient evidence for the jury to find Hawthorne insane at the time of the accident. As the State failed to present sufficient evidence, or any evidence at all, to prove Hawthorne's sanity beyond a reasonable doubt we cannot find that the jury's verdict was supported by substantial evidence. The trial judge erred in not granting Hawthorne's motion *239 for a directed verdict or his motion for a JNOV; thus, we must reverse and render.

II. DID THE LOWER COURT ERR IN REFUSING TO GRANT A MISTRIAL AFTER ONE OF THE JURORS BECAME ILL?
¶ 14. As we reverse and render as to the first issue, we decline to discuss this issue.
¶ 15. THE JUDGMENT OF THE LEE COUNTY CIRCUIT COURT IS REVERSED AND RENDERED. COSTS OF THIS APPEAL ARE ASSESSED TO LEE COUNTY.
KING, P.J., BRIDGES, IRVING AND CHANDLER, JJ., CONCUR. SOUTHWICK, P.J, DISSENTS WITH A SEPARATE WRITTEN OPINION JOINED BY MCMILLIN, C.J., THOMAS AND MYERS, JJ., GRIFFIS, J., NOT PARTICIPATING.
SOUTHWICK, P.J., Dissenting.
¶ 16. The majority reverses and orders that the defendant be discharged. I respectfully dissent. The basis for the reversal is that the majority finds that the undisputed evidence was that the defendant was insane. I disagree with that finding. Secondly, even if a defendant is found to be insane, a jury then is to determine whether he is too dangerous to be released into society. No court has the authority to take that decision away from a jury. Finally, since I agree that the testimony was at least exceedingly weak on the issue of insanity, I would reverse because of the weight of evidence. That would cause the defendant to be subject to another trial.
¶ 17. Nature of Evidence. I agree that the only medical evidence was that the accused was insane. Yet the precedents make plain that a jury should consider all the evidence before it on the question of insanity, not just that presented through medical professionals. Lias v. State, 362 So.2d 198, 201 (Miss.1978). There was other evidence.
¶ 18. My first disagreement with the majority on the issue is one of procedure. The framework presented in the court's opinion is quite orderly. To summarize that view, the State is to put on its case with the presumption of sanity; the defense goes forward with some evidence of insanity. The State must thereafter put on sufficient evidence to prove sanity, or else there is an acquittal. Here, the State never followed up the defense case with a rebuttal. Thus  reverse and render.
¶ 19. That is far too regimented for the precedents that control us. The issue is what does the overall evidence show, both lay and expert? At least one precedent did not require any medical testimony from the State to rebut medical evidence as to sanity. Lias, 362 So.2d at 201.
¶ 20. In Hawthorne's prosecution, there were circumstances that the State insists could be used to disprove the defense theory that the defendant was oblivious to "barriers" and ran through the red light without having the reckless disregard needed for manslaughter. The evidence indicated that Hawthorne was avoiding many other barriers as he drove a considerable distance before causing this wreck. Earlier in his journey he was weaving around traffic, and managed to make it several miles in city driving. At least in that way, the defense medical explanation for his problem was refuted.
¶ 21. On the issue of insanity, the jurors are to consider all the evidence presented. They are not limited to the defense case and then prosecution evidence offered in rebuttal. Evidence is relevant whether it was admitted in the State's case in chief or later. That is the defect in the *240 majority's articulation of a procedure for presenting evidence of insanity to a jury.
¶ 22. Continuing danger. If a jury determines that a defendant was insane at the time of an offense, it then is to decide whether the person "has since been restored to reason, and whether he be dangerous to the community." Miss.Code Ann. § 99-13-7 (Rev.2000). Our entering a judgment of acquittal on appeal takes that decision away from the jury. In a criminal trial, only if a jury makes a finding of continuing dangerousness may an accused be indefinitely committed to a mental institution until his dangerousness has been eliminated. Hendrix v. Gammage, 556 So.2d 354, 356 (Miss.1990). Our action creates unknown consequences for Hawthorne's future commitment.
¶ 23. Weight of evidence. I have already discussed why the entirety of the State's evidence should be considered on the question of insanity. It is improper to compartmentalize the presentations, and look only at evidence presented after the defense's doctors testified about their findings. However, I acknowledge that the evidence of Hawthorne's sanity was quite weak. The failure to present any medical testimony on sanity is suggestive that none could be obtained.
¶ 24. The question of whether a defendant was insane is peculiarly appropriate for jury resolution. I find that some evidence from which jurors could determine that Hawthorne was aware of the wrongness of his actions was before the jury. Nonetheless, there were seven medical professionals who testified that Hawthorne was unable to appreciate the difference between right and wrong. "A new trial is to be granted if the jury's verdict so contradicts `the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice.'" Pierre v. State, 607 So.2d 43, 54 (Miss.1992), quoting Groseclose v. State, 440 So.2d 297, 300 (Miss.1983). I find that there was sufficient evidence to prove sanity, but its weight was meager.
¶ 25. Within a broad range, weighing evidence is solely the jury's function. I am nonetheless left with the firm belief that to allow this conviction to stand based on this evidence is an unconscionable injustice. Therefore I would reverse on the basis of the imbalance in evidentiary weight. Hawthorne therefore could be retried. Tibbs v. Florida, 457 U.S. 31, 46, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). "If the exact evidence and no more is admitted again, the fact that a different jury looking at the same proof reaches the same conclusion means that a second reversal would not necessarily be appropriate in the interests of justice." Edwards v. State, 736 So.2d 475, 484 (Miss.Ct.App.1999).

Conclusion
¶ 26. Where I differ with the majority is that it would have required the trial judge to grant a judgment notwithstanding the verdict, finding that there was sufficient evidence of the criminal acts but that Hawthorne was conclusively proven to be insane. It would be improper before the jury has deliberated to direct a verdict of not guilty by reason of insanity. That would be a verdict of guilt that is excused because of the defendant's mental state. A trial judge cannot direct a guilty verdict. A directed verdict of guilt on each element of the crime which is then excused due to the accused's insanity is also not within the trial court's power. After the jury has found guilt but rejected insanity, a judge who thought that the evidence on insanity was completely one-sided in favor of the defendant would not be directing a verdict of guilt but finding insufficient evidence of sanity.
¶ 27. However, if the trial judge has to wait until after the jury verdict of guilt to act, there is no reasonable manner in *241 which then to give that same jury which just found the defendant sane and guilty, the obligation to accept that the accused was insane at the time and the discretion to resolve whether he "has since been restored to his reason, and whether he be dangerous to the community." Miss.Code Ann. § 99-13-7 (Rev.2000). The jury that has convicted could not reasonably then be asked to disregard its own conclusion and resolve this new and inconsistent issue.
¶ 28. The issue of sanity is always a matter of opinion. It simply cannot be proven conclusively. This makes the issue especially appropriate for jury resolution. Therefore I find it difficult to accept that it would ever be proper for a trial judge to inject his own opinion and override the jury with the opposite decision. Even if such a case might exist, I do not find that it is presented here. However, a judge concerned about an unconscionable injustice may always order a new trial. I am concerned, and would reverse and remand because of the weight of the evidence.
McMILLIN, C.J., THOMAS AND MYERS, JJ., JOIN THIS SEPARATE WRITTEN OPINION.